779 So.2d 125 (2001)
STATE of Louisiana
v.
Cedric CARTER.
No. 99-KA-2234.
Court of Appeal of Louisiana, Fourth Circuit.
January 24, 2001.
*130 Honorable Harry F. Connick, District Attorney of Orleans Parish, Leslie P. Tullier, Assistant District Attorney of Orleans Parish, New Orleans, LA, Counsel for Plaintiff/Appellee.
Christopher A. Aberle, Louisiana Appellate Project, Mandeville, LA, Counsel for Defendant/Appellant.
Court composed of Judge BAGNERIS, Judge TOBIAS, and Judge GORBATY.
MAX N. TOBIAS, Judge.

STATEMENT OF CASE
On 25 March 1998, the State filed a bill of information charging Cedric Carter ("Carter") with three counts of armed robbery (La. R.S. 14:64), three counts of attempted armed robbery (La. R.S. 14:27, 14:64), and one count of illegal use of weapons or dangerous instrumentalities (La. R.S. 14:94). He entered pleas of not guilty on 30 March 1998. Four hearings on the defendant's motion to suppress his identification were held on 26 June 1998, 17 July 1998, 29 July 1998, and 11 August 1998. At the conclusion of the hearings, the trial court found probable cause and denied Carter's motion to suppress. Following trial on 10 September 1998, a twelve-person jury returned a verdict of not guilty on the illegal use of weapons or dangerous instrumentalities charge, but found Carter guilty of the three counts of armed robbery and three counts of attempted armed robbery. On 8 December 1998, Carter was sentenced to serve thirty-five years at hard labor on each count without benefit of parole, probation, or suspension of sentence. The sentences are to run concurrently. Carter's oral motion to reconsider the sentence was denied, and he was granted an appeal.

STATEMENT OF FACTS
During the early morning hours of 1 February 1998, several robberies occurred in the same area of the city. One victim was Linda Burke. Between 3:00 a.m. and 4:00 a.m. on 1 February 1998, while coming from a supper, she decided to stop at a bar located at the corner of North Derbigny and Lapeyrouse Streets. While walking down Derbigny, she noticed a person when he jumped out of a white van with burgundy stripes. She originally assumed the driver of the van was parking the vehicle and for that reason paid little attention to the person until he placed a revolver in her face and told her, "Give it up. You're dead." She was stunned. She looked up and saw that the person was wearing a mask, a hooded sweatshirt with the word "Adidas" on it, blue jeans, and white tennis shoes. She gave the robber her purse, whereupon he jumped back into the van. She watched as the van traveled down Derbigny and turned left at St. Bernard Avenue.
Upon arriving at the bar, Ms. Burke called the police. While talking to the police, she learned that officers were investigating another nearby disturbance that had just occurred on St. Bernard Avenue. Shortly thereafter a police car arrived on the scene. She gave the officers a description of the robber. Later, while standing on the corner, the officers returned and told her they had the van and some suspects. The officers transported her to the St. Bernard Housing Project, the arrest scene. At that time she observed a person in handcuffs standing outside a car. Notwithstanding the fact that Carter insisted that he was not the person who committed the crime, Ms. Burke identified him as the robber based on the clothing he was wearing. No money was taken from her during the robbery, for the only thing in her purse at the time of the robbery was her *131 gun. She identified the purse and gun found at the arrest scene as hers.
Within minutes of that robbery, Gina Thomas and her cousin, Helen Williamson, were robbed in a nearby parking lot while on their way to the Prime Example Club. After parking in the lot next to a McDonald's Restaurant and across the street from the club, they remained in the car for a few minutes. Ms. Thomas removed money from her purse and placed it in her pocket, with the intent of leaving the purse in the car. Ms. Williamson put on makeup. Ms. Thomas urged her cousin to hurry so that they could exit the car. Prior to exiting the car, Ms. Thomas noticed a person walking toward their car with his head down. The person had a hood over his head and was wearing a green-colored jacket. As soon as Ms. Thomas opened the door and stepped out of the car, she looked to her left and saw a black gun pointed in her face. The person told her to put her head down, get back in the car, and instructed her not to look up. Ms. Thomas asked the person what he wanted and offered her purse. The person refused to take it, instead instructing her to remove the money from the purse. All the while, the robber kept the gun pointed at the back of her head. Ms. Thomas finally remembered that she had placed her money in her left front pocket, and handed the robber six or seven dollars therein. After taking the money, the robber instructed her to give him Ms. Williamson's money. The robber repeatedly told her that she was taking too long and urged her to hurry.
Ms. Thomas initially believed that Ms. Williamson was sitting in the passenger seat with her head down as instructed, specifically recalling the robber tell Ms. Williamson: "Put your head down. I told you don't look up. You're looking up. Put your head down." Ms. Thomas dumped the entire contents of Ms. Williamson's purse in her lap but still could not find Ms. Williamson's money. Ms. Williamson finally told Ms. Thomas that her money was in the side compartment. Ms. Thomas removed the money and gave it to the robber.
During the course of the robbery, a truck drove up behind Ms. Thomas's car. The robber leaned into the car in an apparent effort to prevent the people in the truck from seeing what was happening. He stayed there until the truck left. As he exited the car he told Ms. Thomas to find her keys and leave the area. She began looking for her keys, but could not find them. The robber told her she was taking too long and urged her to hurry. The robber finally closed the door of the vehicle and walked across the street to the Shell service station parking lot in the direction of a vehicle that was getting ready to park. However, that vehicle drove off, and the robber started back towards Ms. Thomas and Ms. Williamson. When Ms. Thomas saw the robber heading back in her direction, she urged Ms. Williamson to leave the car. As the robber was coming toward them, Ms. Thomas begged him to go his way and let them go their way. The robber kept his head down and continued walking to the rear of the McDonald's parking lot.
The two ladies ran to the Shell service station parking lot toward some women who were about to exit their cars. They told the women they had just been robbed and warned them to leave. They then crossed the street to the Prime Example Club and sought assistance from one of Ms. Thomas's friends, a disc jockey at the club.
After calling the police, the disc jockey and the owner of the club accompanied them across the street so that they might gather their belongings from the ground. At that time, nobody was in the parking lot. The group was standing outside for about a minute when they heard a gunshot and observed two women running toward the club. They observed another female being stopped by a police officer as she ran up North Broad Street. The disc jockey and a friend jumped back into Ms. Thomas's *132 car and drove across the street to the McDonald's where they began chasing a vehicle. Ms. Thomas assumed they were chasing the people who had committed the robbery.
Approximately twenty minutes later, a police officer arrived at the corner where the crowd was still standing and advised that they had apprehended a suspect. The officer asked if there was anybody else who had been robbed. Ms. Williamson, Ms. Thomas, and another young woman indicated they had. The officer asked the women to accompany him to the arrest scene to make an identification. They did so in two vehicles.
During the robbery Ms. Williamson was able to observe the robber's face and she identified Carter as the robber based upon those observations. She observed that Carter was wearing a dark colored sweatshirt, with the hood off. Ms. Williamson identified a dark colored revolver as the gun that was pointed at Ms. Thomas during the robbery. At trial she identified another silver automatic gun shown to her that resembled a second gun that the robber was carrying at the time that he robbed them.
Ms. Thomas could only identify the defendant as the robber based upon his clothing. Before Carter exited the police car, she told the officer what the robber had been wearing. When he exited the car, he was wearing the same clothes that she had identified. Additionally, Ms. Thomas was able to identify the gun as to type and appearance as that of the robber.
That very same morning, Patricia Taylor was celebrating her birthday at the Prime Example Club with several friends and coworkers. At approximately 4:10 a.m., she was leaving the club with her friends, Destiny Hinson, Melissa Moore, and a man named "Lionel". The foursome were standing next to their cars saying goodbye when Ms. Hinson exclaimed, "Oh, my God." As they turned around, they observed a man coming toward them wearing a "Jason" type mask[1]. The man pointed a gun at them and told them to, "Give it up." Upon hearing the command, Ms. Taylor immediately dropped her purse. At Lionel's suggestion, they all turned around and ran in different directions. As they were running, Ms. Moore and Ms. Taylor heard gunfire. Ms. Moore was running up the street when Police Sgt. Ira Thomas's police car appeared on the scene less than thirty seconds after the incident. Upon seeing the police car, Ms. Moore opened the door and jumped in, hysterically telling Sgt. Thomas what had happened. Sgt. Thomas inquired about the location of the incident, and Ms. Moore directed him to that place. As they turned down the street and saw a white van, the sergeant asked whether the van was the vehicle the robber had used in the robbery. Ms. Moore told him she did not know. He proceeded to follow the van. When Sgt. Thomas activated his lights, the van sped off and did not stop until it reached the St. Bernard Housing Project. When the car in which Sgt. Thomas and Ms. Moore were riding arrived at the Project, the sergeant exited, telling Ms. Moore to remain in the car. Initially, Ms. Moore ducked down in the car. When she looked up, the van, with doors open, was still moving. Ms. Moore did not observe how many individuals fled the van. Police officers later brought two males in handcuffs over to the car and asked if Ms. Moore could identify anyone. She similarly identified Carter as the robber based upon the clothing he was wearing, and advised that the defendant did not take anything from her because she was not carrying a purse. She only had her car keys, an identification, and about three dollars.
At the same time that Ms. Moore was running toward the police car to report the *133 robbery to Sgt. Thomas, Ms. Taylor was running back toward the Prime Example Club. Upon reaching the club after hearing the gun shot, she learned that patrons in the club already knew what had happened because they had been told that another person had been robbed shortly before Ms. Taylor. People in the club also heard the gunshot, thus knowing something was amiss. Ms. Taylor remained at the club thirty minutes to an hour after the incident, when a police officer arrived and transported several of the victims to the St. Bernard Housing Project to identify a suspect. When they arrived, the officers had two men, the suspects, seated in a police car. The officers took the men from the police car, stood them up, and put a spot light on them. Ms. Taylor was only able to identify Carter based on his clothing for he was wearing the same clothes that he was wearing when he robbed her a dark color hooded sweat jacket with writing on it. The officers also showed her a mask, and she identified the mask as the mask used by the perpetrator. Ms. Taylor also identified a purse found at the arrest scene as the black purse she had throw down.
At trial, Sgt. Thomas testified that he was assigned to the night platoon working as a police supervisor on the morning of 1 February 1998. Around 4:00 a.m., while on routine patrol on St. Bernard Avenue between North Galvez Street and North Claiborne Avenue, he heard a broadcast over the radio that an armed robbery had just taken place at North Derbigny and Lapeyrouse Streets. The first description given was of two black males wearing dark clothing. One had a hooded jacket, a "Jason" mask, and was armed with a handgun. He joined another police unit at that scene and was collecting information from a victim when a second broadcast came over the radio concerning another robbery at North Broad and Bruxelles Streets. He left the scene of the first robbery and was approaching North Broad at its intersection with St. Bernard when he heard a gunshot through the open window. When he reached that intersection, he observed a crowd of people running in different directions. A light complexioned female ran up to his vehicle screaming that "they" had just been robbed and "they" were down the street. Immediately thereafter he saw people pointing in the direction of Hope Street yelling and screaming, "They're getting away... They're in the van." He turned right onto Hope Street and saw a white van that the people were pointing to leaving Hope Street headed toward A.P. Tureaud Avenue. He testified that while proceeding to the scene, he noted that the dispatcher had also given a description of two individuals in a white van. The description was almost identical to the description given earlier.
The white van, which had temporary tags, left the scene and made a left-turn onto A.P. Tureaud Avenue. Traveling at a very high rate of speed, the van sped down A.P. Tureaud towards North Broad, apparently fleeing towards the St. Bernard Housing Project with the police car in pursuit. The van ran several red lights and ignored the officers's lights and sirens. As the van turned onto Hamburg Street, the doors opened, and two individuals fled the vehicle, allowing the van to continue rolling until it crashed into a parked vehicle. Sgt. Thomas testified he was twenty feet from the van when the suspects bailed out; the passenger dropped items in the process. He noticed that one of the suspects was holding what appeared to be a couple of bags. As the two subjects ran into the hallway of an apartment at 1539 Sere Street, one of the subjects dropped a bag alongside the steps. He waited outside the stairwell of the apartment for a few moments until other units arrived to assist. Sgt. Thomas and a second officer then climbed the stairwell where the subjects had fled. When they arrived at the third and final landing, they found two male individuals crouched behind a wall in the hallway. They apprehended both, led them down the stairs, and placed them in a *134 police car. The person apprehended along with Carter that morning was a juvenile, B.E.[2] Alongside the outside stairwell on the ground, Sgt. Thomas noticed two ladies' purses and a chrome-plated handgun. After checking the area further, a second gun, a blue-steel revolver, was found about ten feet away from where the purse and chrome-plated handgun were found.
While on the scene, Sgt. Thomas instructed his units to return to North Broad Street, attempt to locate other victims, and bring them to the arrest scene. The victims identified Carter as the person who robbed them. The officers seized Carter's clothing that had been identified at the scene by the victims. They also seized a ski mask that was found on the floor of the van, which the victims identified as the "Jason, Friday the Thirteenth" mask used by the robber. Additionally, the officers seized a chrome-plated handgun, which Ms. Burke identified as belonging to her, that had been discarded along with the purses.
Detective Greg Hamilton testified that on the night of 1 February 1998 he responded to a call indicating that officers involved in a chase needed assistance. According to the broadcast, the officers were following a van containing people who had or possibly had committed an armed robbery. Det. Hamilton arrived at the arrest scene after the suspects had been apprehended. He learned that individuals had been robbed in the 1900 block of North Broad. He went to that North Broad location, took reports from the people who had been robbed, and then returned to the arrest scene. Carter was positively identified by one of the victims as the person who robbed them. He recalled the victims: one was in the driver's seat and did not see the suspect's face; the one in the passenger seat fully observed the perpetrator and said she could identify him if she saw him again. She subsequently identified the defendant, Carter, as the perpetrator.
Once Carter was identified, Det. Hamilton advised him of his Miranda rights and placed him under arrest for armed robbery. Det. Hamilton identified an envelope as one containing $285 that he recovered from Carter. He acknowledged the apparent discrepancy between the money seized from the defendant at the time of his arrest and the money the victims reported had been taken from them.
Carter testified that on 1 February 1998, he was with B.E. between 2:00 a.m. and 3:00 a.m. He claimed that he and B.E. left a bowling alley about 2:30 a.m. He began driving his own car, a 1984 Pontiac Grandprix, and B.E. was driving a white van. They headed to the St. Bernard Housing Project. After delivering some people to an apartment on Gibson Driveway in the Project, he noticed that his car was running hot. He asked B.E. to take him to a service station on North Broad Street so that he could obtain some antifreeze for his car. He testified that B.E. had keys to the van, and B.E. told him the van belonged to his mother. When questioned about B.E. being a fourteen year old, he said B.E. was not fourteen, but rather fifteen or sixteen years old. He further testified that he told B.E. to let him drive the van because they would arrive at the service station more quickly if he drove.
When they arrived at the service station, it was closed, so they turned around and proceeded in the opposite direction on St. Bernard Avenue. As he was about to pass a traffic light, he noticed that a nearby police car had activated its lights. He was about to pull the van over when B.E. told him not to do so because the van was stolen. Upon hearing this, Carter kept driving. Carter proceeded down A.P. Tureaud, made various turns and finally ended up in the St. Bernard Housing Project. As he was turning onto Hamburg Street, he noticed that the police were just *135 starting to turn onto Sere Street. After turning, the police were nowhere in sight, so he jumped out first and ran into the hallway of an apartment. As B.E. exited the van Carter saw a police officer right behind him. B.E. also ran into the hallway and was next to him when the police apprehended both of them.
Carter admitted that he was the driver of the van. He said he did not stop because B.E. told him the vehicle was stolen, and he did not want to go to jail. He claimed that B.E. never told him of any armed robberies. He denied discarding any purses, insisting that he was the person who jumped from the driver's seat, and that he had nothing in his hands at the time. He denied wearing a green hooded sweatshirt or a ski mask that night, insisting that he was wearing a sweater with a light gray hood, black spots, and an orange Adidas emblem in big cuff numbers printed on the hood. He denied wearing the hooded sweatshirt that was introduced at trial. He further stated that he was wearing blue Girbauds and white tennis shoes when arrested. He also testified that he had a mark on his left cheek that had been there since 1990.
Carter testified that when he was arrested, the officers separated him from B.E. placing him in a car by a neighborhood church, and B.E. in a car in a driveway. He claims the police took him out of that car about three times when various alleged witnesses arrived, but the police never took B.E. out of the other car. He further testified that when the witnesses arrived, the officers placed the hood of his sweater on his head, took the hood back off, and then placed him back in the car. He claimed that the officers kept B.E. in the other car until it was time to leave the arrest scene. His clothes were taken from him when he arrived at Central Lockup; however, he insisted that the hooded sweater that he was wearing on the morning of his arrest had not been produced in court that day. Carter denied wearing a green hood or a mask on 1 February 1998, and he denied robbing anyone.

ERRORS PATENT
A review of the record for errors patent reveals none are present.

ASSIGNMENTS OF ERROR NUMBERS 1 AND 4
In assignments of error numbers 1 and 4, Carter argues that the trial court erred in denying the motion to suppress the identification. The defendant argues that the trial judge should have suppressed all or some of the identifications because the identification procedure was impermissibly suggestive.
A defendant has the burden of proof on a motion to suppress an out-of-court identification. La.C.Cr.P. art. 703D. To suppress an identification, the defendant must first prove that the identification procedure was suggestive. State v. Prudholm, 446 So.2d 729 (La.1984). An identification procedure is suggestive if, during the procedure, the witness's attention is unduly focused on the accused. State v. Robinson, 386 So.2d 1374, 1377 (La.1980); State v. Laymon, 97-1520, (La. App. 4 Cir. 3/15/00), 756 So.2d 1160, citing State v. Sterling, 96-1390 (La.App. 4 Cir. 11/13/96), 684 So.2d 74; State v. Rodriguez, 98-2574 (La.App. 4 Cir. 2/16/00), 753 So.2d 339; State v. Broadway, 96-2659 (La.10/19/99), 753 So.2d 801, cert. denied, 529 U.S. 1056, 120 S.Ct. 1562, 146 L.Ed.2d 466 (2000). However, even if the identification procedure is found to be impermissibly suggestive, a defendant must also prove that a substantial likelihood of misidentification occurred as a result of the identification procedure. Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); State v. Prudholm, supra; State v. Hankton, 96-1538 (La. App. 4 Cir.9/16/98), 719 So.2d 546, writ denied 98-2624 (La.1/29/99), 736 So.2d 828. Reliability, as shown by the totality of the circumstances, is the linchpin when deciding the admissibility of identification testimony. Manson, supra; State v. West, 582 *136 So.2d 889 (La.App. 4 Cir.1991). Even a suggestive out-of-court identification will be admissible if it is found reliable under the totality of circumstances. State v. Guy, 95-0899 (La.App. 4 Cir. 1/31/96), 669 So.2d 517, writ denied, 96-0388 (La.9/13/96), 679 So.2d 102. Also to be considered under the totality of the circumstances is the deterrent effect on police behavior so the police will guard against unnecessarily suggestive procedures for fear that their actions will lead to the exclusion of identifications as unreliable. Manson, supra.
In Manson, supra, as adopted by the Louisiana Supreme Court in State v. Prudholm, supra, the court set forth a five-part test to determine whether an identification is reliable. The five factors are: (1) the witness's opportunity to view the defendant at the time the crime was committed; (2) the degree of attention paid by the witness during the commission of the crime; (3) the accuracy of any prior description; (4) the level of the witness's certainty displayed at the time of identification; and (5) the length of elapsed time between the crime and the identification.
In the case at bar, the defendant argues that the out-of-court identification procedure was unduly suggestive to the extent that it rendered the identification unreliable. He first notes that all witnesses were taken to the scene of the arrest where he was then presented to them as he emerged handcuffed from a police car and was placed under a floodlight. He notes that suggestiveness inheres in such a one-on-one, in-field show up.
A one-on-one confrontation between a suspect and crime victim is generally not favored. However, this court has rejected the idea that one-on-one identifications are suggestive per se or inherently suggestive. State v. Martello, 98-2066 (La.App. 4 Cir. 11/17/99), 748 So.2d 1192; State v. Short, 96-2780 (La.App. 4 Cir. 11/18/98), 725 So.2d 23, writ denied, 99-0198 (La.5/14/99), 745 So.2d 11. Courts generally find that one-on-one identifications are permissible when justified by the overall circumstances, particularly where such identifications are closely associated in time with the commission of the crime, and where the victim or witness had the opportunity to view the perpetrator at the time of the crime. State v. Grubbs, 93-2559, (La.App. 4 Cir. 10/25/94), 644 So.2d 1105, writ denied 94-2880 (La.5/5/95), 654 So.2d 323; State v. Walters, 582 So.2d 317 (La.App. 4 Cir.1991), writ denied 584 So.2d 1171 (La.1991); State v. Peters, 553 So.2d 1026 (La.App. 4 Cir.1989). Such identifications are upheld because prompt confrontation between an accused and victim promotes fairness by assuring the reliability of the identification (while the victim's memory is fresh) and the expeditious release of innocent suspects. Grubbs, supra; State v. Bickham, 404 So.2d 929 (La.1981); State v. Robinson, 404 So.2d 907 (La.1981).
In this case, all witnesses identified Carter as the robber shortly after the crimes occurred. One victim, Ms. Moore, was already on the scene when he and his accomplice were captured. Other victims were relocated to the scene shortly thereafter and asked whether they could identify the defendant. Given the fact that the defendant and his accomplice were caught after a high-speed chase within minutes of the crime, it was reasonable, appropriate, and logical to attempt to secure an identification immediately.
Further, the mere fact that the defendant was presented to the witnesses handcuffed and under a floodlight does not mean that the identification was unduly suggestive. The only eyewitness who actually saw the robber's face, Ms. Williamson, testified that she did not recall if the defendant's hands were behind him handcuffed, for she paid no attention to his hands. However, other witnesses noted that the defendant was handcuffed when presented for identification. Given the fact that he had just emerged from a van involved in a high-speed chase with police *137 officers, it is not at all surprising that he was handcuffed. Even identifications made while a suspect is in handcuffs or in a police car will not necessarily render the identification procedure suggestive; and such identifications do not increase the likelihood of misidentification. See State v. Woodberry, 95-2402 (La.App. 4 Cir. 12/27/96), 686 So.2d 984, writ denied, 97-0277 (La.6/20/97), 695 So.2d 1351.
The defendant also complains that the identification procedure was suggestive because he was made to wear the mask found in the back of the van.
In State v. Van Buren, 615 So.2d 455 (La.App. 4 Cir.1993), this court rejected a defendant's argument that an identification procedure was overly suggestive because he was made to wear clothing that was found beside him at the time of his arrest.
Immediately prior to his apprehension, Carter was observed fleeing from the van in which a mask similar to the one described by some of the victims was found. Accordingly, requiring the defendant to place the mask on his face for purposes of assisting the victims in making a positive identification did not necessarily render the procedure overly suggestive.
Finally, the defendant complains that the identification procedure was suggestive because Ms. Burke, Ms. Thomas, and Ms. Williamson admitted that when they were escorted to the arrest site, the police officer specifically told them that their assailant had been captured. A review of the testimony does not support a finding that the police officers specifically told the victims that Carter was the robber. Nor is there any proof that the officers forced or coerced any of the witnesses to identify the defendant as the robber.
At the suppression hearing, Ms. Burke testified that the officers said they had caught the guy and that two guys were in the van. She then added, "they said they got the two witnesses, subjects, however they put it." When specifically asked if they told her they caught the guy who robbed her, she stated that they had two individuals[3] that were in the van that were apprehended. Officers took her to the housing project where they showed her a purse lying on the ground and asked if it was her purse. After she identified the purse and asked about her gun, they asked her if she knew what the suspect looked like. At that time she told them she did not see his face, but she could recognize his clothing. The record does not support a conclusion that the police told Ms. Burke that the defendant was the robber.[4]
The facts of this case are similar to the facts in State v. Valentine, 570 So.2d 533 (La.App. 4 Cir.1990), where a restaurant was robbed in the middle of the night by a man wearing a ski mask. The victims called the police, and the defendant was apprehended shortly thereafter two blocks away. The police officer took the defendant to the scene of the crime to be identified by the victims. The victims were present when an officer was contacted via radio and informed that a suspect had been apprehended. The officer said to the victims: "We have someone we want you to see, to see if this is, in fact, the person who robbed you." Valentine, supra, at 537. The victims subsequently identified that suspect. Although the defendant argued that, because the victims overheard *138 the radio call, they were predisposed to identify him, this court found that the statement by the officer seemed to point out that the suspect might not be the perpetrator, thereby balancing any potential bias resulting from the witnesses overhearing the radio call. In addition, this court noted, "Indeed, by the very nature of a one-on-one identification occurring soon after a crime, there is a possibility that the suspect could be the perpetrator." Id. The victims separately viewed the defendant who was seated in the back of the car. This court upheld the identification of the defendant because there was no showing of unreliability or suggestiveness. See also, State v. Cryer, 564 So.2d 1328 (La. App. 4 Cir.1990); State v. Smith, 577 So.2d 313 (La.App. 4 Cir.1991); State v. Peters, 553 So.2d 1026 (La.App. 4 Cir.1989); State v. Muntz, 534 So.2d 1317 (La.App. 4 Cir. 1988).
The facts of this case are also very similar to the facts in State v. Winfrey, 97-427 (La.App. 5 Cir. 10/28/97), 703 So.2d 63, writ denied, 98-0264 (La.6/19/98), 719 So.2d 481. The court rejected a defendant's argument that the identification procedure was suggestive because he was alone in the backseat of a police car and in handcuffs at the time he was identified by the victims. Approximately 30 to 45 minutes after the robbery, a police officer took the victims to the location where the defendant had been stopped. At the suppression hearing, one victim testified that she identified the defendant as the man who robbed her as soon as she saw him in the back of the police car. She further stated that none of the police officers on the scene suggested to her that the defendant was the robber. Applying the five part Manson test, the court concluded that even if the identification was suggestive, the identification did not present a substantial likelihood of misidentification. Accordingly, the court found no error in denying the defendant's motion to suppress the identification. Significantly, the defendant in Winfrey also contended that there was a substantial likelihood of misidentification because the witnesses could not have seen the robber's face since the perpetrator wore a ski mask. The fact was inconsequential.[5]
If one were to assume that the identification procedure was suggestive, this court would be required to determine whether the identification gave rise to a substantial likelihood of misidentification. If the identification was reliable, the fact that the identification procedure may have been suggestive becomes irrelevant. Generally, when reviewing a trial court's ruling on a motion to suppress, an appellate court is not limited to evidence adduced at the hearing on the motion to suppress; it may also consider any pertinent evidence given at trial of the case. State v. Nogess, 98-0670, (La.App. 4 Cir. 3/3/99), 729 So.2d 132. Accordingly, a review of the totality of the testimony given by the victims at the suppression hearing and trial must be made to determine whether the trial court erred in denying the defendant's motion to suppress.

THE BURKE IDENTIFICATION
At the suppression hearing, Ms. Burke testified that the robbery took no more than three to four seconds. However, it is apparent from her testimony at trial and at the suppression hearing that she began observing the robber prior to the time of the actual robbery. She first saw him when he exited the white van. She testified that she saw the robber coming, but she initially paid little attention to him because she thought the occupants of the van were merely parking. However, when the robber pointed the revolver in her face and told her to give up her purse, she was stunned. She saw that the robber was wearing a "Friday the Thirteenth" *139 type mask, which really caught her attention and caused her to look up and down at the defendant. Although Ms. Burke never saw the robber's face, she had ample time to view his attire and body type. That Ms. Burke's attention was focused more on the Adidas emblem than the color of the sweatshirt is not necessarily indicative of inattentiveness. Notwithstanding the conflict in testimony concerning the color of the hooded sweatshirt that the robber was wearing, Ms. Burke's overall testimony supports a finding that her identification of the defendant was reliable. A review of her entire testimony reveals that she based her identification on multiple factors. She testified that the robber was a little taller than she and that he had a thin build. Because she could see his hands, she knew that he was black. Significantly Ms. Burke was also able to identify pictures of the van into which the robber jumped and the revolver that the defendant placed in her face. She identified a blue and brown purse found at the arrest scene as her purse and a weapon shown in a picture taken at the scene as the weapon that was in the purse taken from her by the robber.
Further, contrary to the defendant's assertion that B.E. was never shown to the victims, Ms. Burke testified that she saw both individuals who had been apprehended. She identified the defendant because of his clothing and his build. It appears that the five factors enunciated in Manson, supra, were met.

THE WILLIAMSON'S IDENTIFICATION
Ms. Williamson was the only victim who actually had an opportunity to see the robber's face.
The testimony given by Ms. Williamson (and Ms. Thomas) support a finding that Ms. Williamson had ample time to view the defendant during the robbery. Ms. Williamson testified that when Ms. Thomas drove into the parking lot, she parked the car directly under a light pole. She testified that at first the robber was hunched over with his shoulders kind of surrounding the car, and at that time, she could not see his face, just his shoulders and below. She noticed that he was wearing a dark jacket and dark pants. She believed the shirt had lettering, but she could not make out the lettering. However, as the robbery progressed a truck passed by, and the people in the truck were looking into Ms. Thomas's car. The robber then crouched down as if he was talking to them. While he was in the doorway, Ms. Williamson was able to get a good look at his face. When he saw her looking at him, he told her, "Don't look at me." She testified that it was a while before the truck left but during that time the robber looked back and she kept looking at him.
Mrs. Williamson testified that during the robbery, she noticed that the robber had more than one gun. She identified a black revolver as the gun the defendant held on her cousin. She stated that the robber also had in his possession another shiny silver gun, which he took out when he crouched down and told her not to look at him. She looked at the robber for about three to five minutes while he was crouched down and she specifically remembered the shape of his head and his tiny eyes. At the suppression hearing she testified that she was positive that the defendant was the person who robbed them. At trial, she was more emphatic, stating that she was 100% sure the defendant was the person who robbed them. She did not see any tattoos on his face, but his broad forehead and eyes stood out in her mind. The fact that Ms. Williamson had no recollection of any marks or tattoos on the defendant's face is irrelevant. The jury heard the defendant's testimony concerning the markings on his left cheek and had an opportunity to view the defendant at trial. They may have found the markings inconsequential and attached no significance to Ms. Williamson's failure to note them. Alternatively, because the defendant was crouched down inside the *140 door on the driver's side, the jury may have concluded that the defendant's left cheek was not visible to Mrs. Williamson, who was seated in the passenger seat.
At each stage (the arrest scene, the suppression hearing, and at trial) Ms. Williamson was able to and did identify Carter as the robber. No misidentification occurred.

THE THOMAS IDENTIFICATION
At the suppression hearing, Ms. Thomas admitted that while she and Ms. Williamson were being robbed, she never looked at the robber's face. However, she testified that she believed that Ms. Williamson was able to see the robber's face. And Ms. Thomas was able to identify the black revolver the robber pointed at her.
She stated that the only distinctive thing about the robber was his clothing: an olive green jacket with a hood attached to it and black pants. At trial, she admitted that when she gave the police officers a description of the robber's clothes, she failed to describe any insignia on the jacket, merely telling the officer that the robber was wearing a green sweatshirt. When asked whether the police report was in error if it said the robber was wearing a black hooded sweatshirt, she indicated that the report was in error. She later admitted that she only knew that the shirt was dark colored, but did not see the exact color because the robber walked in the shadow during the robbery. It was only after they took the defendant out of the police car that she was able to see the precise color of the shirt.
At trial she identified clothes shown to her by the State as clothes worn by the robber on the night of the robbery and identified a black revolver as the gun used. Further, at trial Ms. Thomas stated that when the robber came back toward her and Ms. Williamson the second time she looked at his clothes again. He was still wearing the same clothes, and she was able to see his body type and build. Carter's build was the same as the person who robbed her.
It is possible that her identification of the defendant may have been influenced by hearing Ms. Williamson identify Carter and by the fact that he had the same body type as the robber. However, she was positive that the defendant was the robber when she identified him based on his clothing at the arrest scene shortly after the robbery occurred. (Arguably, this identification, standing alone, appears to be questionable.) However, considering the totality of the circumstances surrounding the identification, one cannot say that there was a likelihood of misidentification of the defendant. Assuming that a likelihood of misidentification existed in this identification, it does not appear the defendant was prejudiced by the admission of Ms. Thomas's particular identification. The jury was well aware of the fact that Ms. Thomas based her identification on clothing and heard the discrepancies in the descriptions given of the clothing worn by the robber. More importantly, Ms. Thomas and Ms. Williamson were both robbed by the same person at the same time. Because Ms. Williamson's identification of the defendant as the robber was clearly reliable, it does not appear that the defendant was harmed by any questionable identification made by Ms. Thomas.

THE MOORE IDENTIFICATION
Ms. Moore testified that the area where the robbery occurred was well lit for a streetlight was directly overhead. She first noticed the robber when he was approximately two to three car lengths away, although she was unclear as to how long she observed him. At the suppression hearing she stated that she observed the robber for fourteen to fifteen seconds as he approached, but did not see the robber's face because he wore a mask. At trial she stated that she observed the defendant for about five seconds.
Apparently, Ms. Moore did not have time to give Sgt. Thomas a description of the robber when she first jumped into his *141 car immediately upon arriving at the scene. Sgt. Thomas testified that she simply stated that she and her friends had been robbed. He testified that he did not ask for a description of the robber, and she did not provide him with any description of the robber or of the vehicle. However, she testified that while on the scene, she described the clothing worn by the perpetrator. More specifically, she told the officer that the perpetrator was wearing dark-colored jeans and tennis shoes. At trial, she identified the Adidas emblem on the shirt and the mask worn by the robber. She stated that she failed to give the officer a description of the perpetrator in terms of height or weight, but described him as dark-skinned based on his hand color.
At the suppression hearing Ms. Moore reiterated that the robber was wearing dark jeans, white tennis shoes, and a dark sweatshirt. She admitted that when she initially described the defendant's clothing to the police officer, she did not recall an insignia or design on the sweatshirt. However, at trial she stated that the robber was wearing dark colored jeans, a hooded jacket with an Adidas emblem, and tennis shoes. She identified the sweatshirt and mask as the ones the perpetrator was wearing. Further, she testified that a gun shown to her by the prosecutor looked like the black gun the perpetrator used that night.
At the suppression hearing, Ms. Moore stated that at the arrest scene the officers presented two men to be identified. The officers took both men out of the police car at the same time and stood them next to one another. The victims identified the defendant as the person who came toward them with the gun. She could not recall whether both men were wearing dark clothing, and she agreed with defense counsel that it was fair to say that the identification of the defendant was based solely on clothing. However, at trial she further testified that the person presented to her at the arrest scene had the same body type and wore the same type clothing as the perpetrator. Thus, it appears she identified the defendant as the robber based on several factors. Given that Ms. Moore had ample opportunity to observe the clothing of the robber and that she admitted that her identification was based on the defendant's body build and clothing, the identification is not unreliable.

THE TAYLOR IDENTIFICATION
Ms. Taylor testified that she was not exactly sure how long she observed the robber, but she estimated that it was a couple of seconds. Like Ms. Moore, Ms. Taylor could only identify the robber by his clothes. She noticed that the robber wore dark colored clothes and a mask and had a gun. (The mask on his face really stood out in her mind.) She could not say if the person was black or white.
At trial, Ms. Taylor testified that she glanced at the robber as he was picking up her purse and stated that he was wearing dark-colored clothes. She added that he had on a sweatshirt type top with "probably white writing". When asked if she remembered what the writing said, she stated, "I couldn't make it out, but I've saw the words. It was kind of, like, probably Adidas on it, the writing on it." She added that he was wearing a white mask, and he pointed a dark-colored gun at Ms. Moore and her. She identified the mask that the prosecutor showed her as the mask the perpetrator was wearing. She also testified that the hooded jacket shown to her by the prosecutor resembled the jacket the perpetrator was wearing.
Ms. Taylor testified that at the arrest scene two individuals were removed from the police car. She identified the defendant as the robber based on his clothing, for he was wearing the same clothes as those worn by the robber. She noted that he was not wearing the mask when first presented to her for identification, but she identified the defendant when the officers placed the mask on him exclaiming "That is the mask". At the arrest scene, the *142 police officers also presented a black purse to be identified, which she stated was hers.
At the suppression hearing Ms. Taylor's original description of the defendant's clothing was quite sketchy. One cannot say with any degree of certainty that the factors set forth in Manson, supra, were met in the suppression hearing. However, at trial she gave more details, and she stated that she gave a description to the police officers. Further, she testified that two males were presented to her; it is apparent that she viewed the defendant and the juvenile. She testified that the build and physique of the defendant closely resembled the build and physique of the robber. Further, the defendant was wearing the same type of clothing as the clothing worn by the robber.
Considering the totality of the circumstances, it appears that there was no likelihood of misidentification of the defendant. Moreover, given the apparent reliability of the testimony given by Ms. Moore (who testified at the suppression hearing and at trial) and Ms. Hinson (who testified at the suppression hearing), it does not appear that the defendant was prejudiced by the denial of the motion to suppress the identification.
The defendant's suggestion that the police "manufactured" the sweatshirt evidence against him was not proven. The defendant testified at trial that he was wearing a gray and black sweatshirt at the time of his arrest. The testimony coincidentally or conveniently coincided with the testimony originally given by Ms. Burke at the suppression hearing. At trial, however, Ms. Burke admitted she was unsure of the color of the shirt worn by the robber, but she vividly recalled the Adidas emblem both at the suppression hearing and trial. Further, Ms. Burke previously gave a very accurate description of the van into which the robber jumped. Her testimony placed the defendant as the passenger in the van, corroborating Sgt. Thomas's testimony that the defendant was in the passenger seat. Since the passenger was undisputedly the person who discarded the stolen purses and guns as he fled the van on Sere Street, this testimony would call into question the defendant's assertion that he knew nothing about the robberies.
In summary, the identification procedure did not result in a substantial likelihood of misidentification. Except for Ms. Williamson, all the victims identified the defendant based primarily upon his clothing. However, at least three of the victims (Ms. Taylor, Ms. Moore, and Ms. Hinson) viewed both the driver and the passenger of the van and identified the defendant as the robber, based on his clothing. All witnesses, except for Ms. Thomas and Ms. Williamson, were struck by the fact that the robber was wearing a "Jason" type mask. The fact that such a mask was found in the van from which the defendant fled most likely influenced the victims's identification. However, because of the rapidity of his capture, the victims had a fresh picture of the clothing worn by the robber at the time they originally identified the defendant during the early morning hours of 1 February 1998.
A trial court's ruling on the admissibility of identification evidence is entitled to great deference and will not be reversed barring an abuse of discretion. State v. Bickham, supra. A defendant fails to show that the trial court abused its discretion by denying a motion to suppress the identification. The testimony of the victims admittedly contained some discrepancies concerning the color and description of the robber's "jacket". However, viewing the totality of the circumstances surrounding the defendant's apprehension, identification, and arrest, it appears that there was no substantial likelihood of misidentification in this case.
The assignment of error is thus without merit.

ASSIGNMENT OF ERROR NUMBER 2
In the second pro se assignment of error, the defendant argues that his sentence *143 is excessive, and the trial court failed to consider mitigating factors.
While conceding that his sentence was within the statutory limits, the defendant nevertheless argues his sentence is unconstitutionally excessive because the trial court failed to comply with La.C.Cr.P. art 894.1. More specifically, he argues that he was not given any consideration for mitigating factors.
Although a sentence is within the statutory limits, a sentence may still violate a defendant's constitutional right against excessive punishment. State v. Sepulvado, 367 So.2d 762 (La.1979). A sentence is unconstitutionally excessive if it makes no measurable contribution to acceptable goals of punishment, is nothing more than the purposeless and needless imposition of pain and suffering, and is grossly out of proportion to the severity of the crime. State v. Lobato, 603 So.2d 739 (La.1992). The trial court has great discretion in sentencing within the statutory limits. State v. Trahan, 425 So.2d 1222 (La.1983). La.C.Cr.P. art. 894.1 sets forth sentencing guidelines to be followed so that a trial judge can tailor the sentence to the particular defendant and his particular crime; but, it is not necessary that the judge recite all of the factors in Article 894.1 as long as there is evidence in the record that the judge considered the factors and tailored the sentence to fit the defendant and his crime. State v. Welch, 550 So.2d 265 (La.App. 4 Cir.1989), writ denied, State ex rel. Welch v. State, 94-0437 (La.6/21/96), 675 So.2d 1071.
In the present case the defendant fails to specify what mitigating factors the trial court failed to consider. A review of the appeal record, including the sentencing hearing of 8 December 1999, amply supports a finding that the trial court complied with La .C.Cr.P. art. 894.1. To assist the court in determining an appropriate sentence, the court requested a presentence investigation report ("PSI"). Although information contained in the report demonstrated that the defendant was a first felony offender, the report also contained information indicating that the defendant had previously been adjudicated a delinquent and had served three years in a juvenile facility. Moreover, as an adult the defendant had several arrests.
The Division of Probation and Parole recommended that Carter be sentenced to ten years on each of the six counts, and that the sentences run consecutively. The PSI contained no information to indicate that mitigating factors should result in a lesser sentence for the defendant. Rather, the official preparing the PSI concluded, "Due to the heinous nature of the crimes and the subject's history of violence, we recommend that the subject be sentenced to ten (10) years each count to run consecutive...."
The trial court noted that following the recommendation in the PSI would mean a sixty-year sentence for the defendant. However, the court noted that all of the robberies or attempted robberies occurred on the same evening, and some of the victims were together in one particular area while another set of victims were together a short distance away. The court also noted that the defendant was only twenty-one years of age and was officially classified as a first offender. The court also stated that the defendant had placed a gun to the head of one of the victims and threatened her, and that a juvenile had accompanied him. The court opined that the defendant should have been serving as a role model for the juvenile instead of leading him into a criminal lifestyle.
The sentencing range for each armed robbery count was ten years to ninety-nine years, without benefit of parole, probation, or suspension of sentence. The maximum sentencing range on each of the attempted armed robbery counts was 49½ years, without benefit of parole, probation, or suspension of sentence. The defendant was sentenced to serve thirty-five years on each of the six counts, to run concurrently, without benefit of parole, *144 probation, or suspension of sentence. Considering the sentencing range, it appears the trial court adequately considered all relevant factors before sentencing the defendant, particularly in view of the adverse recommendation of the Division of Probation and Parole.
The defendant has not proved, and the record does not show, that under the facts of this case the trial court abused its sentencing discretion in sentencing the defendant to the aforementioned concurrent sentences.
This assignment of error is without merit.

ASSIGNMENT OF ERROR NUMBER 3
In the third pro se assignment of error, the defendant argues that the evidence was insufficient to sustain his convictions.
In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Green, 588 So.2d 757 (La.App. 4 Cir. 1991). However, the reviewing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305 (La.1988). A reviewing court must consider the record as a whole since that is what a rational trier of fact would do. If rational triers of fact could disagree as to the interpretation of the evidence, the rational triers's view of all the evidence most favorable to the prosecution must be adopted. The fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protections of due process of law. Mussall; Green, supra. "[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence." State v. Smith, 600 So.2d 1319, 1324 (La.1992).
All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, 504 So.2d 817 (La.1987). "The rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." La. R.S. 15:438.
Generally, direct evidence consists of testimony from a witness who actually saw or heard an occurrence, proof of the existence of which is at issue. State v. Turner, 591 So.2d 391 (La.App. 2 Cir. 1991), writ denied, 597 So.2d 1027 (La. 1992). Circumstantial evidence is evidence of facts or circumstances from which one might infer or conclude the existence of other connected facts. Circumstantial evidence consists of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982).
The defendant argues that the evidence against him was purely circumstantial, and the State offered no proof that he attempted to rob anyone. This argument is without merit.
The defendant was charged with three counts of armed robbery and three counts of attempted armed robbery. The elements of armed robbery are: (1) the taking, (2) of anything of value, (3) from a person or in the immediate control of another, (4) by the use of force or intimidation, (5) while armed with a dangerous weapon. State v. Banks, 96-652, 96-653, p. 12 (La.App. 4 Cir. 1/15/97), 694 So.2d 401, 410. The testimony of an eyewitness that she observed all the elements of the offense, coupled with an identification of the defendant as the perpetrator, ordinarily is sufficient to support a conviction. Banks, 96-652, 96-653 at p. 13, 694 So.2d at 410.
*145 As to the robbery of Ms. Thomas and Ms. Williamson, the State introduced direct evidence to support a finding that the defendant was the robber. Ms. Williamson testified that she saw his face at the time of the robbery. As to the robbery of Ms. Burke, much of the evidence was circumstantial, as the defendant wore a mask, and Ms. Burke never saw his face. However, Ms. Burke was able to give a detailed description of the clothing worn by the robber on the night of the robbery, including the mask he wore. Additionally, she was able to identify the white and burgundy van that the robber jumped from and escaped in on the night of the robbery. She also placed the robber in the passenger seat of the van after committing the crime. Ms. Burke's testimony placing the robber in the passenger seat of the van was corroborated by the testimony of Sgt. Thomas, who also testified that the defendant was the passenger in the van. Further, Sgt. Thomas testified to seeing the defendant drop some bags as he exited the van. Sgt. Thomas actually apprehended the defendant, but did not prepare the police report referred to by the defendant at trial.[6] Sgt. Thomas acknowledged that the police report identifying the juvenile who was arrested with the defendant as the passenger in the vehicle and the defendant as the driver was in error. Sgt. Thomas was not involved in the preparation of the police report; he testified that he provided information to the officer who prepared it. He noted that the report erroneously described the defendant as wearing a black, hooded sweatshirt of unknown type. He further noted that the report stated that the juvenile was wearing blue jeans, a long sleeve black shirt, and tennis shoes. Ms. Burke was able to identify her purse and the chrome plated handgun that was in the purse at the time of the robbery. Both items were recovered at the arrest scene. This evidence all corroborated the victims's testimony that the defendant was the robber.
The defendant was also charged with three counts of attempted armed robbery. As to the attempted robbery of Ms. Hinson, Ms. Taylor, and Ms. Moore, it is noted that the offense of attempt armed robbery does not require the robber succeed in his act. Rather, what is required is an act or omission tending toward the accomplishment of the objective. State v. Trepagnier, 97-2427 (La.App. 4 Cir. 9/15/99), 744 So.2d 181. Ms. Moore and Ms. Taylor testified that the defendant approached them, masked and armed with a pistol. He told them to "give it up". They understood that it was a robbery and fled. Ms. Taylor dropped her purse as she ran, and she glanced back and saw the robber retrieving it. Although Ms. Taylor never saw the defendant's face during the robbery, she too was able to describe his clothing. Further, at the arrest scene, Ms. Taylor was able to identify her purse that was dropped by the robber as he fled from the police.
The jury obviously decided the credibility issue against the defendant and rejected his testimony placing the juvenile in the passenger seat of the van. In addition to identifying the defendant as the passenger, Sgt. Thomas also identified a long sleeve black shirt as the shirt confiscated from the juvenile who was apprehended with the defendant. He identified a green Adidas shirt as the one confiscated from Carter on the scene at Sere and Hamburg Streets. Sgt. Thomas admitted that he did not complete the evidence tags attached to the clothing; rather, he was merely reading the evidence tags of what was seized. However, he participated in the apprehension of the two suspects, and obviously had an opportunity to view both of them.
Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found that the defendant committed the armed robberies and *146 attempted armed robberies of the six victims.
This assignment is without merit.

ASSIGNMENT OF ERROR NUMBER 5
In his fifth pro se assignment of error, the defendant argues that the trial court erred in allowing the introduction of evidence of other crimes.
In this assignment of error, the defendant alleges that because the court erred in allowing a joinder of offenses, evidence of other crimes was allowed to be introduced. Further, he alleges that the State gave no notice of its intent to introduce evidence of other crimes. Assuming that the joinder of the offenses was proper, the defendant's complaint that the court erred in allowing evidence of other crimes has no merit.
La.C.Cr.P. article 493 provides:
Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan; provided that the offenses joined must be triable by the same mode of trial.
La.C.Cr.P. article 495.1, which provides for the severance of joined offenses, provides:
"If it appears that a defendant or the state is prejudiced by a joinder of offenses in an indictment or bill of information or by such joinder for trial together, the court may order separate trials, grant a severance of offenses, or provide whatever other relief justice requires."
Whether a motion to sever should be granted rests within the sound discretion of the trial court whose decision will not be disturbed on appeal absent a showing of abuse of that discretion. State v. Davis, 596 So.2d 358 (La.App. 4 Cir. 1992), writ denied, 604 So.2d 965 (La. 1992). In the instant case, no motion to sever offenses was filed. However, assuming the court felt a danger of prejudice existed to the defendant, it could have ordered separate trials. Generally, "there is no prejudice and severance is not required if the facts of each offense are not complex, and there is little likelihood that the jury will be confused by the evidence of more than one crime." State v. Lewis, 557 So.2d 980, 984 (La.App. 4th Cir.1990), writ denied, 578 So.2d 922 (La. 1991). The defendant has a heavy burden of proof when alleging prejudicial joinder of offenses, and he must make a clear showing of prejudice. State v. Lewis, 97-2854 (La App. 4 Cir. 5/19/99), 736 So.2d 1004, writ denied, 99-2694 (La.3/17/00), 756 So.2d 325. In determining whether joinder of two or more offenses would result in prejudice, a court should consider: (1) whether the jury would be confused by the various counts; (2) whether the jury would be able to segregate the various charges and evidence; (3) whether the defendant would be confounded in presenting his various defenses; (4) whether the crimes charged would be used by the jury to infer a criminal disposition; and (5) whether, especially considering the nature of the charges, the charging of several crimes would make the jury hostile. State v. Lewis, 97-2854 (La App. 4 Cir. 5/19/99), 736 So.2d 1004, citing State v. Guccione, 96-1049, (La.App. 5 Cir. 4/29/97), 694 So.2d, 1060, writ denied, 97-2151 (La.3/13/98), 712 So.2d 869 and State v. Amato, 96-0606, p. 9 (La.App. 1 Cir. 6/30/97), 698 So.2d 972, 982, writs denied, 97-2626 (La. 2/20/98), 709 So.2d 772, 97-2644 (La.2/20/98) 709 So.2d 772.
In the instant case, the defendant was charged and tried on three counts of armed robbery, three counts of attempted armed robbery, and one count of illegal discharge of a firearm. These offenses are similar in nature and triable by the same mode of trial. See, La.C.Cr.P. art. 782. *147 The offenses occurred in the same vicinity of town within an hour or two of each other on the same day. The facts of each offense were not confusing and could be easily distinguished by the jury. The victims were able to present separate and concise testimony concerning the robberies, and no evidence is presented that the jury was confused. The police officers who testified also distinguished each offense. As the facts of each offense were not confusing or complex, there was little likelihood that the jury would have been confused by the state's presenting evidence of the crimes together. No evidence indicates that the defendant was confounded in presenting his defenses or that the crimes charged were used to infer a criminal disposition. No evidence was presented to show that charging of several crimes would make the jury hostile to the defendant. The trial court did not abuse its discretion by trying all offenses together, particularly since no motion to sever offenses was filed.
This assignment is without merit.

ASSIGNMENT OF ERROR NUMBER 6
In his final pro se assignment of error, the defendant argues that his counsel was ineffective.
Generally, the issue of ineffective assistance of counsel is a matter more properly addressed in an application for post conviction relief filed in the trial court where a full evidentiary hearing can be conducted. State v. Prudholm, 446 So.2d 729 (La.1984); State v. Johnson, 557 So.2d 1030 (La.App. 4 Cir.1990). Only if the record discloses sufficient evidence to rule on the merits of the claim do the interests of judicial economy justify consideration of the issues on appeal. State v. Seiss, 428 So.2d 444 (La.1983); State v. Garland, 482 So.2d 133 (La.App. 4 Cir.1986); State v. Landry, 499 So.2d 1320 (La.App. 4 Cir. 1986).
The defendant's claim of ineffective assistance of counsel is assessed by the two part test of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); State v. Fuller, 454 So.2d 119 (La.1984). The defendant must show that counsel's performance was so deficient that the deficiency prejudiced him. Counsel's performance is ineffective when it can be shown that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed a defendant by the Sixth Amendment. Strickland, supra at 686, 104 S.Ct. at 2064. Counsel's deficient performance prejudices a defendant if the accused shows that the errors were so serious as to deprive him of a fair trial. To carry his burden, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, supra at 693, 104 S.Ct. at 2068. The defendant must make both showings to prove that counsel was so ineffective as to require reversal. State v. Sparrow, 612 So.2d 191 (La.App. 4 Cir.1992).
This court has recognized that if an alleged error falls "within the ambit of trial strategy" it does not "establish ineffective assistance of counsel." State v. Bienemy, 483 So.2d 1105 (La.App. 4 Cir. 1986). Moreover, as "opinions may differ on the advisability of a tactic, hindsight is not the proper perspective for judging the competence of counsel's trial decisions. Neither may an attorney's level of representation be determined by whether a particular strategy is successful." State v. Brooks, 505 So.2d 714 (La.1987), cert. denied, Brooks v. Louisiana, 484 U.S. 947, 108 S.Ct. 337, 98 L.Ed.2d 363 (1987).
In the instant case, the record contains sufficient evidence to rule on the merits of the defendant's claim that his counsel was ineffective.
First, the defendant argues that defense counsel was ineffective for failing to object to the State's misjoinder of cases of other crimes. He argues that counsel allowed *148 the state to mislead the jury by combining the alleged crimes into one trial improperly without objection. As discussed above, the joinder of crimes in the instant case was proper under La.C.Cr.P. art. 493. Accordingly, counsel was not ineffective for not objecting to the joinder.
Next, the defendant argues that his counsel was ineffective for allowing the state to introduce an unreliable and impermissibly suggestive identification without objection. As discussed above, the identifications were not unduly suggestive, and were reliable. More importantly, defense counsel objected to the identifications by filing a motion to suppress the identifications and by conducting full-blown hearings on the motion. Once the motion to suppress was denied, defense counsel had no basis for objecting to the identification during the jury trial.
Finally, the defendant argues that his counsel failed to properly investigate and prepare for the factual and legal position his case presented. No evidence of anything that could have been discovered that would have affected outcome has been brought to this court's attention. Accordingly, the defendant fails to show that counsel was ineffective.
The assignment of error is without merit.

CONCLUSION
The defendant's conviction and sentence is affirmed.
AFFIRMED.
BAGNERIS, J., concurs.
BAGNERIS, J., concurring.
I respectfully concur with the Majority's result in this Opinion.
NOTES
[1] Reference here is made to the character "Jason" in the movie, "Friday the Thirteenth."
[2] B.E. are the initials of the juvenile who was arrested with Carter.
[3] Ms. Burke actually used the word "victims" but in context she was referring to the defendant and his companion for at the trial of the case, Ms. Burke specifically stated that the police came and told her that they had the van and some suspects.
[4] According to Ms. Thomas, the officer said: "We have them. We want you to identify them." When asked if the officer said they had caught the people who robbed her, she replied that the officer said, "We caught the people we think robbed you. We want you to identify to make sure that is them." Similarly, Ms. Williamson recalled that the officer told her they had caught a suspect, and they wanted her to take a look at him to see if he was in fact the person that had robbed them. Ms. Taylor stated that the officers never suggested that the suspect was the person who robbed her.
[5] Valentine, supra, and Winfrey, supra, underscore the importance of determining whether a particular identification procedure is reliable in spite of any suggestiveness in the identification procedure.
[6] The defendant did not introduce the police report into evidence.