STATE OF LOUISIANA      *      NO. 2023-KA-0058

VERSUS      *

     COURT OF APPEAL

MICHAEL T. ROBINSON      *
DENZEL WEST      FOURTH CIRCUIT
KIRK POWELL      *

     STATE OF LOUISIANA

* * * * * * *

APPEAL FROM
CRIMINAL DISTRICT COURT ORLEANS PARISH
NO. 544-470, SECTION "E"
Judge Rhonda Goode-Douglas,
* * * * * *
**Judge Rachael D. Johnson**
* * * * * *

(Court composed of Judge Joy Cossich Lobrano, Judge Rosemary Ledet, Judge Rachael D. Johnson)


Sherry Watters
LOUISIANA APPELLATE PROJECT
P. O. Box 58769
New Orleans, LA 70158

Mary Constance Hanes
LOUISIANA APPELLATE PROJECT
P.O. Box 4015
New Orleans, LA 70118-4015

Jane Louise Beebe
LOUISIANA APPELLATE PROJECT
P.O. Box 463
Addis, LA 70710

Michael Robinson #772087
Elayn Hunt Correctional Center
6425 Highway 74
P. O. Box 174
Fox - 4C
St. Gabriel, LA 70776


     COUNSEL FOR DEFENDANT/APPELLANT

Jason Rogers Williams
DISTRICT ATTORNEY
ORLEANS PARISH
Brad Scott
Chief of Appeals
Orleans Parish Assistant District Attorney
619 S. White Street
New Orleans, LA 70119

COUNSEL FOR STATE/APPELLEE

**CONVICTIONS AFFIRMED; REMANDED FOR RE-SENTENCING**
**September 4, 2024**

Defendants Michael Robinson ("Robinson"), Denzel West ("West"), and Kirk Powell ("Powell") (collectively referred to as "Defendants") were convicted of various offenses including second-degree murder, attempted second-degree murder, conspiracy to commit second-degree murder, obstruction of justice, and conspiracy to obstruct justice in response to a collective fourteen-count indictment. On appeal, all three Defendants allege there was insufficient evidence to support their convictions and that their sentences were either illegal and/or excessive. After reviewing the record, we affirm the Defendants' convictions. However, because of sentencing errors, we vacate the sentences imposed and remand to the district court for re-sentencing.

## FACTUAL AND PROCEDURAL HISTORY

### Factual History and Indictment

The series of events leading up to and subsequent to the murders in this case all happened in the Algiers community on the west bank of New Orleans, Louisiana. The Defendants, victims, and witnesses in this case were all well acquainted with one another as either friends and/or relatives. On July 18, 2018, Leroy Benn, Jr. ("Benn Jr.") and his son, who goes by the same name ("Benn III")

1

[1], were shot at multiple times while on their front porch at 3423 Vespasian Boulevard. At the time of the shooting, Keyon Powell ("Keyon"), Defendant Powell's sister; Gavonte Lampkin ("Gavonte"); and Shantrell Parker ("Shantrell") were at a friend's house on Vespasian Boulevard. Once the gunfire subsided, Keyon, Gavonte, and Shantrell walked a half a block down the street to ascertain the condition of Benn Jr. and Benn III. Benn Jr. succumbed to his injuries and died. Benn III sustained non-lethal lower body injuries. On the night of July 29, 2018, the charred remains of Gavonte and Shantrell's bodies were found in the woods. Each of the bodies had multiple gunshot wounds to the head.

On February 7, 2019, the State filed a fourteen-count indictment charging Defendants with various offenses included therein. Robinson was charged with four counts of second-degree murder pursuant to La. R.S. 14:30.1; three counts of conspiracy to commit second-degree murder pursuant to La. R.S. 14:26 and La. R.S. 14:30.1; four counts of obstruction of justice pursuant to La. R.S. 14:130.1; two counts of conspiracy to obstruct justice pursuant to La. R.S. 14:26 and La. R.S. 14:130.1; and one count of attempted second-degree murder pursuant to La. R.S. 14:27 and La. R.S. 14:30.1.

Powell was charged with two counts of second-degree murder; one count of conspiracy to commit second-degree murder; and two counts each of obstruction of justice and conspiracy to obstruct justice.

West was charged with second-degree murder; conspiracy to commit second-degree murder; attempted second-degree murder; three counts of

_____

[1] Despite the son not officially being named Leroy Benn III, he will be referred to as such throughout the opinion for clarity.

obstruction of justice; and two counts of conspiracy to commit second-degree murder.[2]

On March 18, 2019, Defendants appeared for arraignment and pleaded not guilty to all counts. On May 10, 2022, Co-Defendant, Terence Favorite ("Terence") filed a motion to sever Defendants, which was granted without opposition on May 12, 2022.[3] On May 16, 2022, jury voir dire began and trial commenced on May 22, 2022.

**Relevant Trial Testimony**

*Murder of Benn Jr. and Shooting of Benn III*

Keyon testified that on July 18, 2018, she, Shantrell, Gavonte, Robinson, and West were visiting a friend's residence located on Vespasian Street about a half block away from Benn Jr.'s residence. While they were all on the porch talking, Robinson and West left. Twenty to thirty minutes after they left, Keyon heard gunshots coming from the direction of Benn Jr.'s residence. Sometime after the gunshots subsided, Keyon went to Benn Jr.'s residence. She saw that Benn Jr. had been shot, that Robinson and West had returned wearing different clothing, and that Robinson's gun holster was empty. Keyon recalled that Robinson asked her where Benn Jr. had been shot. After she said that he was shot in his chest or legs, Robinson said that he "was trying to get him in his head."

---

[2] The State ultimately severed one count each of second-degree murder, conspiracy to commit second-degree murder, and obstruction of justice from Robinson's indictment with respect to the victim, Reena Smith. In the same indictment, the State also charged former Co-Defendants Terence and Ronald Robinson ("Ronald"), Michael Robinson's brother, with two counts each of conspiracy to obstruct justice.

Co-Defendant, Terence was arrested pursuant to the instant indictment on May 18, 2021, and he pled not guilty on May 27, 2021. Additionally, the State amended the charges against Co-Defendant Ronald Robinson to include two counts of failure to report the commission of a felony, violations of La. R.S. 14:131.1, to which he pled guilty. Ronald was sentenced to serve two concurrent terms of one year each, to be served in Orleans Parish Prison.

[3] Following the trial, Terence entered guilty pleas on the counts to commit conspiracy to obstruct justice in connection with the investigation into the murders of Gavonte and Shantrell.

3

Rachell Powell ("Rachell"), Defendant Powell's mother, testified that on July 18, 2018, Robinson and West visited her residence wearing all black clothing. She recalled that when she saw Robinson later that evening, he was wearing different clothing. Rachell further testified that Robinson said he had shot Benn Jr. and that he wished he would have killed Benn III as well. Rachell reported the statements to the police after Shantrell and Gavonte were killed.

Linda Benn ("Linda"), Benn Jr.'s mother, testified that on July 18, 2018, when she learned that Benn Jr. had been shot, she drove to Benn Jr's residence and Chante Sparks ("Chante"), Benn Jr.'s girlfriend, told her that Benn Jr. had been taken to the hospital. Linda testified that four hours after she arrived at the hospital, Benn Jr. succumbed to his injuries from the shooting. Linda further testified that she and Chante had a conversation about where Chante and Benn Jr.'s children would live, agreeing that the kids should stay with Linda for their safety. However, the children never came to live with her and she would later see her grandson playing catch with Robinson.

### Murder of Gavonte and Shantrell

Leante Wilson ("Leante"), Defendant Powell's girlfriend, testified that during the summer of 2018, she lived at Powell's residence on 5631 Tullis Drive ("Powell's Residence") with Powell and their daughter. She testified that on July 28, 2018, she was awakened by Robinson and Terence entering the house. While they were there, she heard Robinson and Terence go to retrieve the handgun that Kirk Favorite ("Kirk") allegedly used to shoot Terence.[4] The following evening,

---

[4] On July 18, 2018, approximately five hours after Benn Jr. was murdered, police received reports indicating that Kirk allegedly shot his nephew, Terence, in a separate incident. Kirk acknowledged that he was arrested for shooting his nephew Terence and denied that he agreed to testify in exchange for leniency in his prosecution.

4

upon exiting the restroom, Leante found her daughter, a teenager named Kristian, and Shantrell's infant son in a room. Leante did not see Shantrell or Gavonte. When she went outside to discuss the situation with Powell, she saw Robinson's vehicle in the driveway. Shortly thereafter, Leante heard gunshots from inside her residence. Powell ran inside while the gunshots were still firing. Robinson exited the Powell residence, carrying his long gun, with Powell following shortly after with the kids. Leante testified that Robinson threatened to kill her if she said anything. After they exited the residence, everyone got in Robinson's car and drove to Leante's grandmother's house, and then shortly after drove to Robinson's apartment.

During the drive, Leante learned of Gavonte and Shantrell's deaths. She heard Robinson say "I got them b***hes." Leante testified that she was scared and worried that Robinson would kill her too. Upon arriving at Robinson's apartment, Leante heard Robinson tell West, Powell, Terence, and former Co-Defendant Ronald Robinson, Michael Robinson's brother, that he planned to get some bleach and Fabuloso to clean the crime scene. That night, Leante testified that Robinson, West, and Powell departed Robinson's apartment to clean the crime scene, but she did not physically see them at the Powell residence. After spending a few nights at Robinson's apartment, Leante returned to Powell's residence and noticed that it was clean and it smelled as if cleaning products were used. Leante testified that when she returned to live at Powell's residence, Robinson was concerned that she "was going to rat on him," and planned to kill her and Powell as a result.

Leante testified that she was present at Robinson's apartment when the police executed a search warrant at the residence on August 15, 2018. She accompanied the detectives to the police station for an interview and initially

withheld information because she was "scared for [her] life." Before she left, she began to feel guilty because she loved Shantrell like a sister. She returned to the interview room and "gave [the detective] the real statement." Leante did not recall seeing Terence at the time Shantrell and Gavonte were shot. Leante also testified that she knew Robinson wanted to kill Gavonte because she heard him say "I gotta get that [n-word] cause I'm hearing they say he (sic) trying to take me fishing," which Leante explained to mean "Imma [kill] him before he [kill] me."

Kirk testified that he had known Shantrell since she was eleven months old and loved her "like a daughter." Kirk testified that he had been dating Rachell for twenty-eight years and they had four children together, including Defendant Powell. Kirk further testified that he was aware that Robinson called the police to have him arrested so that he could kill Shantrell. Kirk also testified that he delivered a letter written by Rachell to the police. The letter contained criminal allegations against Robinson.

Shantrice Parker ("Shantrice"), Shantrell's mother, testified that she saw Shantrell on July 27, 2018, but became worried when she had not heard from her or Gavonte for several days. Shantrice testified that Kirk was arrested on July 29, 2018, and she felt scared and unsafe because Robinson said that he was going to kill her, her mother, and her brother. Shantrice testified that after she learned of Shantrell's death, Robinson called her to try to convince her to implicate Terence for the Gavonte and Shantrell murders.

Rachell testified that on July 29, 2018, she learned that Kirk was going to jail for allegedly shooting Terence. Rachell recalled that later that day, Robinson and Terence visited her residence "to brag" about having Kirk arrested. She recalled Robinson saying that Gavonte was "trying to set [him] up with [Kirk]."

6

Rachell testified that twenty minutes after Robinson left her house, Shantrell called Rachell's daughter. While on speakerphone, Rachell heard Shantrell say that "she was in a car with [Robinson], going on Tullis to get [some pills]."[5]

Rachell then testified that later in the evening on July 29, 2018, she went to Robinson's residence and observed that Powell and Leante were acting strange. She recalled that Powell and Leante spent time in the bathroom vomiting and neither of them would speak to her. On the way home from Robinson's residence, she encountered Elena Robinson and Courtney West, the respective sisters of Defendants Robinson and West, on the street; and they told her about Gavonte and Shantrell's death. Rachell recalled that three days later, Robinson and West came to her house asking for a garbage can. Rachell noticed that Robinson and West smelled like "dead people," and she noticed that Robinson's car smelled like "a dead dog or a dead body." When Rachell inquired about the smell, Robinson stated that there was a dead dog in his vehicle and that he was planning on burying it in an empty lot across the street. Rachell recalled that on another occasion, before Gavonte and Shantrell's charred remains were identified, Robinson visited Rachell's residence. He said that he heard Rachell and her daughter were "going around saying …that he killed [Shantrell and Gavonte]." Rachell denied the accusation and pretended she did not know they were dead.

Rachell then testified that after Kirk was released from jail, she told him that Robinson and Terence killed Shantrell and Gavonte. She then wrote the letter detailing this information, and Kirk delivered the letter to the police department.

_____

[5] At trial, the State advanced a theory that Robinson's plan to murder Gavonte and Shantrell was to lure them to Powell's residence to buy Tramadol pills.

On cross-examination, Rachell testified that she did not witness the shooting of Benn Jr., Shantrell, or Gavonte.

Keyon testified that on July 29, 2018, Kirk was arrested after Robinson called the police on him. Keyon later learned that shortly after Kirk's arrest, Robinson picked up Shantrell and Gavonte and ended up "in the woods somewhere." Keyon testified that on the evening of July 29, 2018, Elena Robinson and Courtney West arrived at her residence to drop off Shantrell's and Gavonte's baby. Later that evening, Powell and Leante arrived at her residence. Leante, in particular, was looking "sick to her stomach [and] throwing up." Keyon stated that she was scared to testify at trial because she was threatened by Robinson during a phone call after he committed the murders.

Triontris Lampkin ("Triontris"), Gavonte's mother, testified that she had last seen Gavonte and Shantrell on July 28, 2018, and was unable to contact either of them for several days. Triontris testified that she spoke to Powell, at Kirk's house, about her concern that Robinson had killed them. Triontris testified that Powell began screaming at her, saying "you don't know nothing." After seeing a news report regarding the location of Gavonte and Shantrell's remains, Triontris went to the area and found Gavonte's shirt and Shantrell's jacket amongst the rubble.

### Investigation into the Murder of Benn Jr.

New Orleans Police Department ("NOPD") Detective James Fyfe ("Det. Fyfe") testified that on July 18, 2018, he and his partner responded to a shooting reported in the 3400 block of Vespasian Street. Upon arrival, Det. Fyfe heard a woman screaming and observed a trail of blood on the walkway leading to the door. The woman directed Det. Fyfe and his partner into the residence, where he found the two victims, Benn Jr. and Benn III. Det. Fyfe recalled that Benn Jr.

8

sustained multiple gunshot wounds to the abdomen and that Benn III had been shot in the foot. Once Det. Fyfe was told that the suspects were "two black males in black clothing, with weapons, in the area", he conducted a sweeping search of the area. Det. Fyfe was wearing a body camera on the day of the incident and played the footage for the jury while providing narration.

NOPD Homicide Detective Theo Kent ("Det. Kent") testified that he conducted the investigation into the homicide of Benn Jr. and located surveillance footage that recorded the assailants as they approached Benn Jr.'s residence. He described the footage as showing two male subjects coming from the side alleyway of an abandoned apartment complex. Det. Kent stated that throughout the video, you could see the two men pacing back and forth. He further described that at some point during the video, you could see the two males raising their firearms and firing shots into the direction of something outside of camera view. Det. Kent also located spent cartridge casings in the overgrown grass and additional projectile fragments that were located in Benn Jr.'s driveway and front porch. On cross-examination, Det. Kent testified that he was provided a "tip" that Kirk, Robinson, and West were all involved in the shooting. He further testified that he later excluded Kirk as a perpetrator because he did not appear physically capable of sprinting away from the shooting as the assailants had in the surveillance footage.

The State re-called Det. Fyfe to the witness stand; and he testified that on July 29, 2018, he received a call for service on the whereabouts of Kirk, who was wanted for a shooting earlier in the month. Kirk was located inside of a residence on 2200 block of Lauradale Street. Det. Fyfe further testified that Robinson placed the call and was present with Terence in a vehicle down the block from the residence where Kirk lived. Det. Fyfe approached Robinson and Terence, and the

encounter was recorded on the body camera that he wore at the time. This footage was also played for the jury while Det. Fyfe narrated. During this interaction, Det. Fyfe recalled seizing two handguns from Robinson and Terence, and an assault rifle from Robinson's vehicle. Shortly thereafter, Kirk was apprehended by Det. Fyfe without resistance. Det. Fyfe said that Kirk was "unarmed, compliant and subdued." Det. Fyfe described Robinson as proactively involved in the case, but he was concerned that Robinson was still in an ongoing dispute. During cross-examination, Det. Fyfe testified that police reports indicated that Kirk allegedly shot Terence, approximately five hours after Benn Jr. was murdered. Det. Fyfe also testified that nothing indicated West to be involved in either of those shootings and that Robinson had not been seen at the scene of Benn Jr.'s murder.

NOPD Officer Verna Jones ("Off. Jones") testified that she was stationed at the front desk of the Fourth District Police Station on August 8, 2018, and that her body camera captured interactions within the police station. Off. Jones body camera footage showed someone, resembling Kirk, deliver a two-page, hand-written note to her. The note alleged that Robinson and West had killed Benn Jr. because Robinson was dating Benn Jr.'s girlfriend, Chante.

*Investigation into the Murders of Gavonte and Shantrell*

Former NOPD Officer Roderick Carey ("Off. Carey") testified that on July 29, 2018, he was living in an apartment complex in the Algiers area near the intersection of Maumus and Bennet Street, commonly known to locals as the cutoff. Off. Carey recalled that when he pulled into the complex around 6:30 p.m., he heard gunshots. He observed that the gunshots came from a nearby residence on Tullis Drive and reported the incident on the police radio. Off. Carey drove to the

location on Tullis Drive, identified it as a "fourplex", and relayed that information to the police dispatcher.

NOPD Sergeant Nicholas Williams ("Sgt. Williams") testified that he investigated the Shantrell and Gavonte murders. On the night of July 29, 2018, Sgt. Williams arrived at the cutoff in Algiers where Shantrell and Gavonte's charred remains were found. Sgt. Williams noticed that both bodies had multiple bullet wounds to the head. He recalled that once he received the autopsy report, he contacted the Orleans Parish Communication District and asked whether gunshots were reported recently throughout the city. The only gunshots reported were from Off. Carey, who reported gunshots in the 5600 block of Tullis Drive while off-duty. Sgt. Williams testified that during his investigation he learned the identity of both victims and also learned that they were associated in some way with the gunshots heard in the 5600 block of Tullis Drive.

NOPD Lieutenant Wayne DeLarge ("Lt. DeLarge") testified that he was the on-call sergeant for the homicide section on July 29, 2018, and the overall supervisor for the detectives in this case. Lt. DeLarge testified that he received a call that two burned bodies were found at the cutoff. Lt. DeLarge described several photographs of the charred remains, noticed spray-paint located near one of the victims, and defects in the victims skulls.

Doctor Samantha Huber ("Dr. Huber"), an Orleans Parish Chief Pathologist and Chief Deputy Coroner, testified that on July 31, 2018, she conducted autopsies of Gavonte and Shantrell. Dr. Huber described Gavonte's body as mostly blackened, charred, and in a "boxers stand." Dr. Huber testified that Gavonte had two recent gunshot wounds to the head. She explained that one bullet entered the left side of his skull and exited "the left front of the skull," and the other bullet

11

entered the right side of his skull and was lodged in the left side of his brain. Dr. Huber also testified that she located two older bullets inside of Gavonte's left lung and right back of the shoulder, but concluded that they had come from a prior shooting and did not contribute to his death. Dr. Huber determined that Gavonte was most likely deceased at the time that his body was burned. Dr. Huber then testified that Shantrell was in a similar condition as Gavonte, describing her as having fourth-degree burns covering sixty-five to seventy-five percent of her body. Dr. Huber classified Shantrell's death as a homicide that resulted from "multiple gunshot wounds to her head, right forearm, and the right side of her chest."

Sgt. Williams testified that on August 7, 2018, he used a ballistics-sniffing K-9 dog in the 5600 block of Tullis Drive. He located several spent casings in the yard at 5631 Tullis Drive during his search. Sgt. Williams then testified that on August 8, 2018, he was told that Kirk dropped off a letter for him that was useful to his investigation. Sgt. Williams stated that on August 10, 2018, he learned of potential evidence recovered from a burn site in an empty lot in the 1800 block of Lauradale Street. The evidence was a burned spent shell casing, a charred axe, partially burned cargo shorts, and a gold-colored shoe. Sgt. Williams said he received a call on August 13, 2018 that a fire occurred at 5631 Tullis Drive. He relocated to that area and discovered a "Blazer .45 auto spent casing," and a "Horandy" rifle-round spent casing by the rear door in the backyard.

Sgt. Williams testified that public surveillance cameras, located at 6000 block of Tullis Drive, recorded on July 29, 2018, showed a "white Chevy Impala moving in and around the 6000 block of Tullis." An unidentified individual exited the Chevy Impala and went into the townhouses in the 6000 block of Tullis. After a few minutes the individual left and drove off. Three minutes after reporting the

gunshots, Carey's vehicle is seen on the footage. Around 10:16 p.m., the Chevy Impala returned to 5631 Tullis Drive. Sgt. Williams conducted a voluntary interview with Robinson, which was later played for the jury. Sgt. Williams also interviewed Leante at some point during the investigation process. Sgt. Williams recalled that initially, Leante was not truthful, but she later provided information that corroborated the information Sgt. Williams had gathered.

Corporal Joshua Corea ("Cpl. Corea"), an investigator with the Louisiana State Fire Marshal's office, testified that he worked as an investigator for the Louisiana State Fire Marshall's Office and investigated the fire at 5631 Tullis Drive, a two-story, four unit apartment building. Cpl. Corea testified that the fire originated in two places in the rear unit of 5631 Tullis Drive: just outside the rear door and near the stove in the kitchen. Amongst the fire debris, Cpl. Corea located burned clothing and several bullets. Cpl. Corea also noted that sample from the rear door of the residence contained gasoline, but there were no gasoline cans or lawn equipment located near the area that would explain the presence of the gasoline.

Sgt. Williams further testified that he eventually obtained search warrants for Robinson's vehicle and apartment, located on 2108 Springbrook Lane. The search of Robinson's residence yielded a black "Draco" rifle that fired "7.62 by .39" caliber rounds, and a handgun seized from Robinson's person at the time. Several nine-millimeter, Luger, live rounds, a ".380, auto live round," and "one Fiocchi USA .45 live round," and Robinson's phone were also found. The search of Robinson's car yielded two gas cans. The interior and trunk of Robinson's vehicle was also swabbed for DNA samples. Additionally, Robinson's vehicle had

tote bags that contained household and kitchen items, medicine, medical records belonging to Chante, and financial documents bearing Benn Jr.'s name.

NOPD Detective Matthew Riffle ("Det. Riffle") testified that he was in a special operations unit and was tasked with the execution of high-risk warrants. Det. Riffle secured 2108 Springbrook Lane while homicide detectives executed a search warrant. Det. Riffle testified that he observed Robinson's vehicle in the parking lot of the building. Det. Riffle's body camera footage recorded Robinson saying he wanted the officers to return his handgun and big gun that was seized from his person and his residence, respectively.

NOPD Sergeant Terrence Hilliard ("Sgt. Hilliard") testified that he participated in the execution of the search warrant of 2108 Springbrook Lane. Upon entering the residence, Sgt. Hilliard observed Robinson wearing a holster with a loaded nine-millimeter firearm. Sgt. Hilliard seized the firearm after instructing him not to touch the handgun and put his hands in the air.

The court qualified Ashley Cook ("Ms. Cook") as an expert in DNA analysis with no objection. Ms. Cook testified that she conducted DNA analysis and compared DNA swabs taken from West to a suspected blood sample taken from "the rear driver's side door panel" of Robinson's vehicle. Ms. Cook also took a suspected blood sample from a speaker wire that had been located in the trunk of Robinson's vehicle. Ms. Cook found that West was "excluded as the donor of the DNA profile" taken from the door panel. However, West's DNA profile could not be excluded as one of two contributors of DNA discovered on the speaker wire.

The court qualified NOPD Firearms Examiner Sean McElrath ("Mr. McElrath") as an expert in firearms and tool mark examination. Mr. McElrath analyzed the ballistic evidence collected in this case and testified that three of the

four projectile fragments recovered from Shantrell's autopsy were consistent with the ".38 caliber class." However, one of the projectile fragments was a ".45 caliber class," which led to Mr. McElrath concluding that Shantrell had been shot by at least two separate and distinct firearms. Only projectile fragments of a ".45 caliber class" was recovered from Gavonte because the other projectiles were too deteriorated. Mr. McElrath further testified that the casings recovered from 5631 Tullis Drive, had been fired from a Draco rifle seized from Robinson's residence. In addition, three of the Luger nine-millimeter shell casings had been fired from the Canik nine-millimeter firearm that was seized from Robinson's holster during the search of his residence. Mr. McElrath also testified that a charred, Fiocchi, forty-five caliber casing was recovered from the burn site on 1800 Lauradale Street, and was the same brand and caliber of live rounds discovered inside of Robinson's residence. On cross-examination, Mr. McElrath stated that none of the projectiles located during the autopsies of Shantrell and Gavonte were linked to either of the firearms seized from Robinson during the search of his residence.

**Procedural History**

On May 27, 2022, the jury returned a unanimous verdict. The jury found Robinson guilty of second-degree murder of Benn Jr, Gavonte, and Shantrell; obstruction of justice in connection with the murder of Benn Jr., Gavonte, and Shantrell; conspiracy to obstruct justice in connection with the murder of Benn Jr., Gavonte, and Shantrell; conspiracy to commit second-degree murder of Benn Jr., Gavonte, and Shantrell; and aggravated battery of Benn III. The jury also found West and Powell guilty of obstruction of justice and conspiracy to obstruct justice in connection with the Gavonte and Shantrell murders. In addition to his obstruction of justice and conspiracy to obstruct justice convictions, Powell was

15

also found guilty of conspiracy to murder Gavonte and Shantrell. Following the trial, Robinson had one count of second-degree murder, obstruction of justice, and conspiracy to commit second-degree murder dismissed with respect to victim Reena Smith.

On September 13, 2022, the trial court denied Defendants respective motions for new trial and sentenced Defendants. Robinson received mandatory life sentences at hard labor without benefit of parole, probation, or suspension of sentence on each count of second-degree murder; a forty-year sentence on each count of obstruction of justice; a twenty-year sentence of imprisonment at hard labor on both counts of conspiracy to obstruct justice; a thirty-year sentence for conspiracy to commit second-degree murder; and a ten-year sentence for a lesser, included charge of aggravated battery instead of attempted second-degree murder. The trial court also erroneously imposed a thirty-year sentence on one charge of conspiracy to commit second-degree murder despite Robinson being found not guilty. The trial court sentenced West to forty years for both counts of obstruction of justice and twenty years for both counts of conspiracy to obstruct justice. The trial court sentenced Powell to forty years for both counts of obstruction of justice; twenty years for both counts of conspiracy to obstruct justice; thirty years for conspiracy to commit second-degree murder. This timely appeal followed.

On appeal, Robinson raises the following assignments of error: (1) the trial court erred in imposing a sentence on a charge for which Robinson was found not guilty; (2) the evidence was insufficient to sustain the convictions on all counts; (3) the trial court erred in failing to declare a mistrial when the State introduced footage wherein Robinson told police he had prior arrests; (4) the trial court erred in failing to observe the twenty-four-hour sentencing delay following the denial of

16

Robinson's motion for a new trial; (5) the sentences imposed are constitutionally excessive; and (6) trial counsel provided ineffective assistance during the sentencing phase. In addition, Robinson raised a pro se assignment of error, alleging that the trial court erred in granting the State's challenges for cause for jurors Tamineh Haug ("Haug") and Renee Blanche ("Blanche").[6]

West raises the following assignments of error: (1) the trial court erred in granting the State's challenges for cause for jurors Haug and Blanche; (2) the evidence was insufficient to sustain the convictions on all counts; (3) the trial court erred in failing to sever the Defendants and/or the offenses; (4) the trial court erred in failing to observe the twenty-four-hour sentencing delay following the denial of West's motion for a new trial; and (5) the sentences imposed are constitutionally excessive.

Powell raises the following assignments of error: (1) the trial court erred in failing to observe the twenty-four-hour sentencing delay following the denial of Powell's motion for a new trial; (2) the evidence was insufficient to sustain the convictions on all counts; (3) the trial court erred in failing to sever the Defendants and/or the offenses; and depriving Powell of his Sixth Amendment right to confrontation; and (4) the sentences imposed are constitutionally excessive.

In addition, there are three errors patent discerned from the record that all relate to sentencing: the trial court failed to observe the twenty-four-hour sentencing delay following the denial of Defendants' respective motions for new trial; the trial court imposed a sentence of thirty years on Robinson for conspiracy to murder Benn Jr. despite being acquitted; and the trial court failed to impose a

_____

[6] In addition to this, Robinson provided a pro se supplemental argument to his counseled, second assignment of error.

17

sentence for West's conviction of obstruction of justice in connection with the investigation into the murder of Shantrell.

**DISCUSSION**

**Errors Patent**

*Twenty-Four Hour Sentencing Delay*

Defendants raised the issue of the trial court's failure to observe the twenty-four-hour sentencing delay following the denial of each of their motions for new trial. La. C.Cr.P. art. 873 provides,

> If a defendant is convicted of a felony, at least three days shall elapse between conviction and sentence. If a motion for a new trial, or in arrest of judgment, is filed, sentence shall not be imposed until at least twenty-four hours after the motion is overruled. If the defendant expressly waives a delay provided for in this article or pleads guilty, sentence may be imposed immediately.

The Louisiana Supreme Court has held that failure to observe a twenty-four hour delay is not harmless error if the Defendant does not waive the delay and challenges the sentence. *State v. Francis*, 19-0227, p. 1 (La. 4/29/19), 268 So. 3d 289 (citing *State v. Augustine*, 555 So. 2d 1331 (La. 1990)). The Louisiana Supreme Court also held that merely participating in the sentencing hearing is insufficient to constitute an express waiver as required by La. C.Cr.P. art. 873. *State v. Kisack*, 16-0797, p. 7 (La. 10/18/17), 236 So. 3d 1201, 1205. In the case *sub judice*, the court denied Defendants' motions for new trial. The record shows that after mitigating factors were considered by the trial court, sentences were immediately imposed on Defendants without inquiring whether they were ready for sentencing. There was also no indication that Defendants waived the twenty-four hour required delay for sentencing. The trial court erred by not observing the delay period as required by La. C.Cr.P. art. 873 after the Defendants challenged

18

their sentences with motions for new trial, and there was no express waiver. As such, we vacate Defendants' sentences and remand to the trial court for re-sentencing.

The remaining assignments of error regarding Defendants' sentences are moot based on our determination that the trial court did not adhere to the requirements outlined in La. C.Cr.P. art. 873.[7]

### *Illegal Sentence Imposed*

The second error patent is Robinson being sentenced to thirty years at hard labor for conspiracy to murder Benn Jr., despite being acquitted of that charge. In addition to this being an error patent, Robinson raises this as his first assignment of error. According to La. C.Cr.P. art. 882(A), "[a]n illegal sentence may be corrected at any time by the court that imposed the sentence or by an appellate court on review." After review of the record, we find that Robinson's sentence should be vacated because he was found not guilty for conspiracy to murder Benn Jr. We remand to the trial court to correct the sentencing, the minute entries for the verdict and sentence, and the commitment order.

### *Failure to Impose Sentence*

The third error patent is the trial court's failure to impose a sentence for West's conviction of obstruction of justice in connection with the investigation into the murder of Shantrell. During the sentencing hearing, the trial court failed to pronounce on the record a sentence for West related to this conviction. According to La. C.Cr.P. art. 920(2), "[a]n error that is discoverable by a mere inspection of the pleadings and proceedings" is within the scope of appellate review. Thus, we

---

[7] Robinson's 5th and 6th assignment of error, West's 5th assignment of error, and Powell's 4th assignment of error are moot.

remand to the trial court so that West can be sentenced on the record for his conviction of obstruction of justice in connection with the investigation into the murder of Shantrell.

### Insufficient Evidence to Sustain Convictions

Defendants' argue that there was insufficient evidence presented at trial to sustain their convictions. In particular, Robinson argues that there was insufficient evidence for his second-degree murder, aggravated battery, and obstruction of justice convictions; Robinson and Powell argue that there was insufficient evidence for their conspiracy to commit second-degree murder convictions, and all Defendants argue that there was insufficient evidence for their respective conspiracy to obstruct justice and obstruction of justice convictions.

The United States Supreme Court outlined the standard for reviewing convictions for sufficiency of evidence in *Jackson v. Virginia*:

> [The Appellate Court must determine], after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. … This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution.

443 U.S. 307, 319 (1979) (emphasis in original).

"[A] factfinder's credibility determination is entitled to great weight and should not be disturbed unless it is contrary to the evidence." *State v. Williams*, 11-0414, p. 18 (La. App. 4 Cir. 2/29/12), 85 So. 3d 759, 771. "Conflicting statements as to factual matters is a question of weight of the evidence, not sufficiency." *State*

*v. Wells*, 10-1338, p. 5 (La. App. 4 Cir. 3/30/11), 64 So. 3d 303, 306 (citing *State v. Jones*, 537 So. 2d 1244 (La. App. 4 Cir. 1989)). The trier of fact solely determines the weight of the evidence for conflicting statements; and they may accept or reject, in whole or in part, the testimony of any witness. *Id*. "The testimony of a single witness, if believed by the trier of fact, is sufficient to support a conviction." *Id*. (citation omitted). In *State v. Ragas*, this Court further expounded on this standard, stating that "[t]he reviewing Court must consider the record as a whole since that is what a rational trier of fact would do." 98-0011, p. 13 (La. App. 4 Cir. 7/28/99), 744 So. 2d 99, 107 (internal quotations and citation omitted). Furthermore, "[i]f rational triers of fact could disagree as to the interpretation of the evidence, the rational trier's view of all the evidence most favorable to the prosecution must be adopted." *Id*.

If circumstantial evidence is used to prove that the alleged offense was committed, La. R.S. 15:438 requires that "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." Circumstantial evidence is defined as "evidence of facts or circumstances from which one might infer or conclude the existence of other connected facts." *State v. Carter*, 99-2234, p. 31 (La. App. 4 Cir. 1/24/01), 779 So. 2d 125, 144. "Circumstantial evidence consists of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience." *Id*. In light of the standard for reviewing convictions for sufficiency of evidence, we will address each of the convictions by reviewing the evidence and testimony presented at trial.

***Robinson's Second-degree Murder, Aggravated Battery, and Obstruction of Justice Convictions***

Robinson asserts that there was insufficient evidence to sustain his convictions for second-degree murder of Benn Jr., Gavonte, and Shantrell; the aggravated battery of Benn III conviction; and the obstruction of justice in the murder of Benn Jr. After a review of the record, we find that the jury had sufficient evidence to justify Robinson's convictions. These assignments of error are without merit.

La. R.S. 14.30.1 defines second-degree murder as the killing of a human being "[w]hen the offender has a specific intent to kill or to inflict great bodily harm." La. R.S. 14:10(1) describes specific intent as the "state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." "Specific intent may be inferred from the circumstances of the crime and the Defendant's actions or activities." *State v. Smith*, 94-2588, p. 5 (La. App. 4 Cir. 3/27/96), 672 So. 2d 1034, 1037 (citing *State v. Graham,* 420 So. 2d 1126, 1127 (La. 1982); *State v. Marshall*, 94-1282, p. 5 (La. App. 4 Cir. 6/29/95), 657 So. 2d 1106, 1108).

La. R.S. 14:33 and 34 define aggravated battery as "the intentional use of force or violence upon the person of another … committed with a dangerous weapon." In the case *sub judice*, the doctrine of transferred intent is applied for the conviction of aggravated battery of Benn III. The doctrine of transferred intent is the following:

> [w]hen a person shoots at an intended victim with the specific intent to kill or inflict great bodily harm and accidentally kills or inflicts great bodily harm upon another person, if the killing or inflicting of great bodily harm would have been unlawful against the intended victim actually intended to be shot, then it would be unlawful against the person actually shot, even though that person was not the intended victim.

22

*State v. Ross,* 12-0109, p. 8 (La. App. 4 Cir. 4/17/13), 115 So. 3d 616, 621 (quoting *State v. Strogen*, 35,781, p. 4 (La. App. 2 Cir. 4/3/02), 814 So. 2d 725, 728).

The second-degree murder conviction for the murder of Benn Jr. and the aggravated battery of Benn III conviction were supported by multiple witnesses' testimony and the physical evidence presented at trial. The surveillance footage presented during trial showed two men, dressed in black clothing, approach the Benn residence and fire multiple gunshots from their respective firearms towards Benn Jr. and Benn III. Once both men finished shooting at the Benn residence, they fled from the scene. As a result of this shooting, Benn Jr. and Benn III sustained multiple gunshot wounds. Benn Jr. eventually succumbed to his wounds, dying at the hospital shortly thereafter. Benn III sustained non-lethal injuries to his lower body. Officer Fyfe, who arrived at the Benn residence shortly after the shooting, testified that there was no evidence of other gunshots being fired in the neighborhood around the same time. The search of Robinson's vehicle and house presented a connection between Robinson and Benn Jr. because it contained Chante's medical documents along with Benn Jr.'s financial documents and multiple personal items. The search of Robinson's home led to discovery of a nine-millimeter, semi-automatic handgun. Further, the ballistics report revealed that nine, nine-millimeter spent casings were discovered in the yard where the perpetrators fired their weapons.

Witnesses Keyon and Rachell, who were both with Robinson and West before the crime was committed, also testified about both Defendants' involvement. Keyon testified that while with a friend on Vespasian Street, she was accompanied by Robinson and West, who were both wearing black clothing at the time. About twenty minutes after Robinson and West left her, she heard gunshots

23

and saw bullets strike near the area she was sitting. Keyon further testified that both Robinson and West arrived at the Benn residence twenty minutes after the shooting took place. Keyon observed that both Defendants were wearing different clothing and that Robinson's holster was empty. Keyon also testified that she heard Robinson state that he intended to shoot Benn Jr. in the head. Rachell corroborated Keyon's testimony. Rachell testified that Robinson admitted to her that he killed Benn Jr. and wished that he had killed Benn III as well.

In addition to the witness testimony at trial, based on the physical evidence presented, a rational juror could have found that Robinson was connected to the Benn Jr. murder. The surveillance footage supports a finding that he had the specific intent to fire multiple rounds towards the Benn residence. Further, Keyon and Rachell both testified that Robinson admitted to killing Benn Jr and hoped that he could have killed Benn III as well. Viewing the evidence in the light most favorable to the prosecution, a rational juror could have found that Robinson had the specific intent to kill Benn Jr. and that he fired the gunshots that killed Benn Jr. and injured Benn III.

The second-degree murder convictions for the Gavonte and Shantrell murders are also supported by the evidence presented at trial. During trial, Leante testified that she was at 5631 Tullis Drive with Powell and her children when Robinson arrived with Gavonte and Shantrell. When Leante went outside to speak with Powell, she heard multiple gunshots from inside the house. Powell then went inside the house; and shortly thereafter, more gunshots were heard. Robinson and Powell then exited the house with the two children and ordered Leante into the car. Leante testified that Robinson confessed to her about killing Gavonte and Shantrell when he said "got them b***hes." Leante further testified that upon arriving at

Robinson's house, Robinson told multiple people at his apartment that he had killed them and that he needed help with cleaning the murder scene and disposing the evidence. Keyon also testified that she learned Gavonte and Shantrell's bodies were found "burning in the woods."

Surveillance footage showed Robinson's vehicle return to the scene of the crime at 10:16 p.m. Lt. DeLarge testified that at 11:30 p.m., on the same night of the murder, a fire was reported in the woods and that the charred remains of Gavonte and Shantrell were found. Upon inspection, Gavonte and Shantrell appeared to have died from multiple gunshot wounds to the head. A warranted search of Robinson's vehicle yielded two firearms and several different brands and calibers of ammunition along with two gas cans containing liquid. A search of the yard behind Powell's residence revealed multiple shell casings that were the same brand as the ammunition found in Robinson's vehicle.

Based on the evidence and testimony presented, a rational juror could have found that Robinson killed Gavonte and Shantrell. The witness testimony of Leante and Keyon also showed that Robinson intended to kill Gavonte and Shantrell. The video surveillance, discovery of the gas cans and ammunition, and the examination of Gavonte and Shantrell's charred remains revealed how Robinson conducted the murder. Viewing the evidence in the light most favorable to the prosecution, a rational juror could have found that Robinson possessed the specific intent to kill Gavonte and Shantrell, and that he fired the gunshots to do so.

Robinson's obstruction of justice conviction in connection with the murder of Benn Jr., is also supported by the evidence presented at trial. La. R.S. 14:130.1 defines obstruction of justice as the following:

25

A. The crime of obstruction of justice is any of the following when committed with the knowledge that such act has, reasonably may, or will affect an actual or potential present, past, or future criminal proceeding as described in this Section:

(1) Tampering with evidence with the specific intent of distorting the results of any criminal investigation or proceeding which may reasonably prove relevant to a criminal investigation or proceeding. Tampering with evidence shall include the intentional alteration, movement, removal, or addition of any object or substance either:

(a) At the location of any incident which the perpetrator knows or has good reason to believe will be the subject of any investigation by state, local, or United States law enforcement officers; or

(b) At the location of storage, transfer, or place of review of any such evidence.

(2) Using or threatening force toward the person or property of another with the specific intent to:

(a) Influence the testimony of any person in any criminal proceeding;

(b) Cause or induce the withholding of testimony or withholding of records, documents, or other objects from any criminal proceeding;

(c) Cause or induce the alteration, destruction, mutilation, or concealment of any object with the specific intent to impair the object's integrity or availability for use in any criminal proceeding;

(d) Evade legal process or the summoning of a person to appear as a witness or to produce a record, document, or other object in any criminal proceeding;

(e) Cause the hindrance, delay, or prevention of the communication to a peace officer, as defined in R.S. 14:30, of information relating to an arrest or potential arrest or relating to the commission or possible commission of a crime or parole or probation violation.

"Nothing beyond 'movement' of the evidence is required by the statute if accompanied by the requisite intent and knowledge." *State v. Powell*, 15-0218, p. 11 (La. App. 4 Cir. 10/28/15), 179 So. 3d 721, 728, (citing *State v. Jones*, 07-1052, p. 10 (La. 6/3/08), 983 So. 2d at 101). This Court has found that there was

sufficient evidence to sustain a conviction for obstruction of justice when a Defendant "left the scene of the crime with the firearm used in the commission of the crime." *State v. Bethley*, 22-0849, p. 10 (La. App. 4 Cir. 6/21/23), 368 So. 3d 1148, 1156, *writ denied*, 23-00965 (La. 1/17/24), 377 So. 3d 242. Additionally, the evidence established that the "firearm was not located at the scene of the crime and never recovered by law enforcement." *Id*. The *Bethley* Court held that viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could find that defendant fled the scene of the crime with the firearm and obstructed justice by tampering with the evidence. *Id*.

In the case *sub judice*, trial testimony and evidence showed that nine, nine-millimeter spent casings were discovered in the yard where the perpetrators fired their weapons at Benn Jr. and Benn III. However, the two firearms recovered from the search of Robinson's residence did not match the casings discovered in the yard and the firearms associated with the shell casings were never recovered by law enforcement. Keyon testified that Robinson's holster was empty when he arrived at the Benn residence after the shooting. Similar to *Bethley*, a rational trier of fact could find that the failure to locate the firearm associated with the crime amounts to Robinson committing obstruction of justice. Viewing the evidence in the light most favorable to the prosecution, a rational juror could have found that Robinson obstructed justice in the murder of Benn Jr. by removing the firearm used in perpetrating the crime.

Viewing the record as a whole and the evidence in the light most favorable to the prosecution, Robinson's second-degree murder convictions for the Benn Jr., Gavonte, and Shantrell murders; aggravated battery of Benn III conviction; and

obstruction of justice in the murder of Benn Jr. conviction, are all supported by the evidence presented at the trial.

### Robinson and Powell's Conspiracy to Commit Second-degree Murder Convictions

Robinson and Powell argue that there was insufficient evidence to sustain their respective convictions for conspiracy to commit second-degree murder of Gavonte and Shantrell.

La. R.S. 14:26(A) defines criminal conspiracy as the following:

> Criminal conspiracy is the agreement or combination of two or more persons for the specific purpose of committing any crime; provided that an agreement or combination to commit a crime shall not amount to a criminal conspiracy unless, in addition to such agreement or combination, one or more of such parties does an act in furtherance of the object of the agreement or combination.

This Court has found that direct or circumstantial evidence may be used to prove criminal conspiracy. *State v. Hickerson*, 19-1077, p. 16 (La. App. 4 Cir. 12/30/20), 312 So. 3d 1124, 1136 (citing *State v. Johnson*, 438 So. 2d 1091, 1099 (La. 1983)).

In the case *sub judice*, there is circumstantial evidence placing Robinson and Powell at Powell's residence at the time of the shooting, and evidence to support that they conspired to kill Gavonte and Shantrell. Leante testified that on the night before the Gavonte and Shantrell murders, Robinson and Terence arrived at her residence to retrieve the firearm[8] that Powell had taken from Kirk. She further testified that Robinson and Terence retrieved the firearm in order to have Kirk arrested. Keyon testified that she learned of Robinson calling the police to arrest

---

[8] The firearm retrieved from Leante's residence is allegedly the firearm used to shoot Terence.

Kirk, and then shortly after picking up Gavonte and Shantrell.[9] Rachell corroborated Keyon's testimony when she testified that Robinson and Terence arrived at her residence "to brag" about having Kirk arrested. She further testified that Robinson stated that Gavonte was "trying to set [him] up with [Kirk]." Rachell also testified that she heard Shantrell say on the phone that she was heading to Powell's residence with Robinson to purchase Tramadol shortly before she was killed. Based on the evidence presented at trial, and viewing it in the light most favorable to the prosecution, a rational juror could have found that Robinson and Powell planned to have Kirk arrested, and lured both Gavonte and Shantrell to the Powell residence so that they could kill them without interference. Robinson and Powell's conspiracy to commit second-degree murder convictions are supported by the evidence presented at trial. This assignment of error has no merit.

***Defendants' Conspiracy to Obstruct Justice and Obstruction of Justice Convictions***

Defendants argue that there was insufficient evidence to sustain the conspiracy to obstruct justice and obstructing justice in the murders of Gavonte and Shantrell.

The conspiracy to obstruct justice in connection with the Gavonte and Shantrell murders convictions were supported by Leante's testimony and surveillance footage. Leante testified that shortly after the shooting of Gavonte and Shantrell, Robinson told multiple people that he killed them. Leante also testified that Robinson discussed a plan to clean the crime scene and dispose of the

---

[9] The State presented a theory at trial that Defendants wanted to kill Shantrell and Gavonte but needed to get Kirk, who was like a father to Shantrell, out of the way to do so. Once they were successful in having Kirk arrested, Defendants were able to carry out their plan to kill Shantrell and Gavonte.

evidence with cleaning products. Following this conversation, Robinson, Powell, and West departed Robinson's apartment together. Surveillance footage presented during trial also revealed that Robinson was not a large man, and thus a rational fact finder could find that he would have required assistance from Powell and West to move the victims' bodies from Powell's residence to the woods. There was also no evidence showing that Powell or West refused to participate in the plan, nor did they report the crime to the police.

Powell argues that the State failed to disprove his affirmative defense that he was acting under duress from threats by Robinson to participate in obstructing justice. Powell relies on La. R.S. 14:18(6), which states that an offender's crime, except murder, is justifiable "if it is committed through the compulsion of threats by another of death or great bodily harm, and the offender reasonably believes the person making the threats is present and would immediately carry out the threats if the crime were not committed." However, Powell failed to raise this affirmative defense at trial. During closing argument, his attorney only mentioned that Powell was under duress when he entered Robinson's car after the Gavonte and Shantrell murders. It is not the State's burden to disprove an affirmative defense raised by a defendant. The Louisiana Supreme Court outlined this burden of proof in *State v. Cheatwood*. It held that the State is required to prove beyond a reasonable doubt the elements of the offense, and a defendant is required to prove by a preponderance of evidence the exculpatory circumstances that would constitute the affirmative defense. *State v. Cheatwood*, 458 So. 2d 907, 910 n.4 (La. 1984). Based on the testimony, surveillance footage, and lack of an affirmative defense, a rational juror could have found that Defendants conspired to obstruct justice.

There was also sufficient evidence to support the Defendants' respective obstruction of justice convictions in connection with the Gavonte and Shantrell murders. Keyon testified that Robinson threatened her after she learned of the deaths of Gavonte and Shantrell. Leante testified that a few days after Gavonte and Shantrell were murdered in her home, she returned to her residence and observed that it was clean and smelled of bleach. Further, video footage revealed that Robinson's vehicle returned to the scene of the crime at 10:16 p.m. Lt. Wayne DeLarge testified that at 11:30 p.m., on the night of the murder, a fire was reported in the woods; and the charred remains of Gavonte and Shantrell were found. Viewing the circumstantial evidence in the light most favorable to the prosecution, a rational juror could have found that Defendants obstructed justice in connection with the Gavonte and Shantrell murders by threatening a witness, disposing the victims' bodies, and cleaning the crime scene. Defendants' convictions of conspiracy to obstruct justice and obstruction of justice are fully supported by the evidence presented at trial, and this assignment of error has no merit.

**Failure to Declare Mistrial**

Robinson argues that the trial court erred when it failed to declare a mistrial after the State played police body camera footage of the search of Robinson's residence, during which Robinson told police that he had been previously arrested thirty-eight times. The grounds for mistrial and admonishment are outlined in La. C.Cr.P. art. 770 and 771. La C.Cr.P. art. 770 provides the following:

> Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:

(1)  Race, religion, color or national origin, if the remark or comment is not material and relevant and might create prejudice against the defendant in the mind of the jury;
(2)  Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible;
(3)  The failure of the defendant to testify in his own defense; or
(4)  The refusal of the judge to direct a verdict.
An admonition to the jury to disregard the remark or comment shall not be sufficient to prevent a mistrial.  If the defendant, however, requests that only an admonition be given, the court shall admonish the jury to disregard the remark or comment but shall not declare a mistrial.

La. C.Cr.P. art. 771 provides the following:

In the following cases, upon the request of the defendant or the state, the court shall promptly admonish the jury to disregard a remark or comment made during the trial, or in argument within the hearing of the jury, when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury:
(1)  When the remark or comment is made by the judge, the district attorney, or a court official, and the remark is not within the scope of Article 770; or
(2)  When the remark or comment is made by a witness or person other than the judge, district attorney, or a court official, regardless of whether the remark or comment is within the scope of Article 770.
In such cases, on motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial.

Robinson argues that the State introduced evidence of his previous crimes despite agreeing to redact the comment from the footage. However, after reviewing the record, there is no indication that the trial court excluded this evidence pursuant to a defense motion, nor ruled it inadmissible. Additionally, the trial court confirmed with both parties that nothing in the national database suggested that Robinson had been arrested thirty-eight times. Further review of the record shows that Robinson's motion for mistrial would not fall under La. C.Cr.P. art. 770

because the comment was not made by the trial judge, district attorney, or a court official, but instead, was made by Robinson to the police. The comment that Robinson is referencing did not allege that he committed a specific crime. And, the trial court offered Robinson the option to either provide curative instruction to the jury, or a stipulation that Robinson had not been arrested thirty-eight times, but Robinson denied both. As such, the trial court did not err in refusing to grant Robinson's motion for mistrial; and this assignment of error is without merit.

**Failure to Sever Defendants**

Defendants Powell and West argue that the trial court erred in denying their respective motions to quash based on misjoinder of Defendants. Specifically, the motion to sever filed by former Co-Defendant Terence on May 10, 2022, the motion to quash based on misjoinder of offenses and motion to sever Defendants filed by former Co-Defendant Ronald, and the motion to quash for misjoinder of offenses filed by Powell on June 25, 2019. Despite Powell and West arguing that the trial court erred in denying their motions to quash based on misjoinder of Defendants, there is no indication in the record that either Defendant filed his own motion to sever Defendants, nor is there any indication that they joined either of their former Co-Defendant's motions. Furthermore, Terence's motion to sever was granted on May 12, 2022, without opposition from the State or an objection from either Powell or West. La. C.Cr.P. art. 841(A) states, in particular:

> An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence. … It is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take, or of his objections to the action of the court, and the grounds therefor.

Powell and West did not object to Terence's motion to sever at the time it was granted, nor did they raise their own motions to sever. Therefore, Defendants waived these arguments and cannot raise this issue for the first time on appeal. *See State v. Carter*, 10-0614, pp. 27-28 (La. 1/24/12), 84 So. 3d 499, 521. Nonetheless, even if the motion to sever was not waived, Powell and West are not entitled to relief. Severance is governed by La. C.Cr.P. arts. 704 and 705.[10] Defendants are not entitled to severance as a matter of right and the decision regarding whether to severance is within the discretion of the trial court. *State v. Krodinger*, 12-0134, p. 12 (La. App. 4 Cir. 2/27/13), 128 So. 3d 270, 278 (citing *State v. Prudholm*, 446, So. 2d 729, 741 (La. 1984)). "A severance is necessary if the defenses of the co-defendants are mutually antagonistic to the extent that one co-defendant attempts to blame the other, causing each defendant to defend against both his co-defendant and the state. *Id.* (citing *State v. Prudholm*, 446 So. 2d 729, 741 (La. 1984)). However, if the co-defendant's argument is to "deny his own involvement and not implicate the other defendant, justice does not require a severance; this rule applies even though the co-defendant's testimony may, by inference, be damaging to the

_____

[10] La. C.Cr.P. art. 704, titled *Severance*, states in pertinent part:
    Jointly indicted defendants shall be tried jointly unless:
    (1) The state elects to try them separately; or
    (2) The court, on motion of the defendant, and after contradictory hearing with the district attorney, is satisfied that justice requires a severance.
La. C.Cr.P. art. 705, titled *Effects of Severance*, states in pertinent part:
    When the court has ordered severance of an indictment, the district attorney shall file separate indictments.
    In the case of a grand jury indictment, no further action by the grand jury is required. Severed indictments shall be considered as filed on the date of the filing of the original indictment. Proceedings under the original indictment are not affected by the severance except insofar as they may be inconsistent with some other provision of this Code. The effects of a severance, as stated in this article, apply to severances under Articles 532(3) and 704.

other defendant." *Id*. (citing *State v. Brown*, 527 So. 2d 12, 14 (La. App. 3 cir. 1998)).

In the case *sub judice*, neither Powell nor West allege, that a co-defendant was antagonistic towards another. Further, the record does not show a co-defendant attempting to blame another. Neither Powell nor West had to defend against both a co-defendant and the State. Powell and West argued that they were prejudiced by being tried with Robinson, but as held in *State v. Krodinger*, justice does not require severance if testimony, by inference, is damaging to a co-defendant. Powell and West failed to show they suffered prejudice by not having their trial severed from Robinson, thus we find this assignment of error has no merit.

La. C.Cr.P. art. 841(A) also applies to Powell's assertion that he was deprived of his Sixth Amendment right to confrontation. Powell argues that the trial court deprived him of his Sixth Amendment right to confrontation when improper "hearsay" statements from Robinson were included in Leante and Rachell's testimony, along with video and audio recordings of Robinson at his house during the search and later from police questioning. Powell failed to raise this objection during trial, thus the issue was not preserved for appeal.

Powell asserts that the trial court erred in denying his motion to quash based on misjoinder of offenses, particularly as it pertains to the murders of Reena Smith and Benn Jr., because they were not connected to the Gavonte and Shantrell murders. In particular, Powell asserted that he would be prejudiced at trial by the inclusion of the Benn Jr. murder charge and the attempted murder of Benn III charge. Prior to trial, the State severed the charges relating to the murder of Reena Smith and presented no evidence of that murder to the jury. During Powell's motion to quash, the State contended that the four homicides were initially

35

connected because they were part of a common scheme or plan. La. C.Cr.P. art. 493 provides the following:

> Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan; provided that the offenses joined must be triable by the same mode of trial.

After reviewing the record, this Court finds that the trial court did not err in denying Powell's motion to quash. The record reflects that the evidence underlying Powell's guilty verdicts was based on testimony regarding the circumstances surrounding the Gavonte and Shantrell murders. Leante's testimony about Powell discussing a plan to dispose of Gavonte and Shantrell's bodies, the cleaning supplies needed to clean the crime scene, and then departing Robinson's apartment to accomplish the plan, led the jury to convict Powell for counts 7, 8, 9, 10, and 11. In addition, Robinson was the only defendant found guilty of Benn Jr.'s murder and aggravated battery of Benn III. As such, the trial court did not err in refusing to grant Powell's motion to quash based on the misjoinder of offenses.

**Granting State's Challenge for Cause**

Robinson and West argue that the trial court erred in granting the State's challenge's for cause for jurors Haug and Blanche.

Louisiana Constitution article I, section 17 guarantees that the defendant "shall have a right to full voir dire examination of prospective jurors and to challenge jurors peremptorily." La. C.Cr.P. art 799 provides that:

> In trials of offenses punishable by death or necessarily by imprisonment at hard labor, each Defendant shall have twelve peremptory challenges, and the state twelve for each Defendant. In all other cases, each defendant shall

have six peremptory challenges, and the state six for each defendant.

La C.Cr.P. art. 797 outlines that the state or a Defendant may challenge a juror for cause on the following:

> (1) The juror lacks a qualification required by law;
> (2) The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence;
> (3) The relationship, whether by blood, marriage, employment, friendship, or enmity between the juror and the defendant, the person injured by the offense, the district attorney, or defense counsel, is such that it is reasonable to conclude that it would influence the juror in arriving at a verdict;
> (4) The juror will not accept the law as given to him by the court; or
> (5) The juror served on the grand jury that found the indictment, or on a petit jury that once tried the defendant for the same or any other offense.

A trial court is also granted broad discretion when determining whether to reject a juror for cause. *State v. Jones*, 474 So. 2d 919, 926 (La. 1985). According to La. C.Cr. P. art. 800(B), "[t]he erroneous allowance to the state of a challenge for cause does not afford the Defendant a ground for complaint, unless the effect of such ruling is the exercise by the state of more peremptory challenges than it is entitled to by law." The trial court record reflects that the State exercised a total of thirty-six peremptory challenges, thereby exhausting the number permitted by law. Thus, Robinson and West may be afforded relief if the trial court erroneously granted a State challenge for cause.

In the case *sub judice*, the trial court granted the State's objection for cause for juror Haug because she had a moral objection to a life sentence and she had a work-related international conference that conflicted with two trial dates. The

37

defense objected to the State's challenge for cause for juror Haug. After stating that she had a moral objection to finding a Defendant guilty of murder, Haug was never rehabilitated. She never said that she could render an impartial verdict. La. C.Cr.P. art. 798(1) outlines that the State specifically can challenge for cause on the grounds that "[t]he juror is biased against the enforcement of the statute charged to have been violated, or is of the fixed opinion that the statute is invalid or unconstitutional." When asked if she could weigh the State's evidence to determine if they have proven their case beyond a reasonable doubt and whether she could reach a verdict of guilty or not guilty, she said she would be able to "find a verdict" but reaffirmed that the "bar would be very high."

Additionally, Haug having a prior commitment to attend a work related international conference would qualify as a reason to excuse her as a juror under La. C.Cr.P. art. 783(B). The trial court may excuse a juror on its own motion if jury service "would result in undue hardship or extreme inconvenience … prior to or after his selection for the general venire, jury pool, or jury wheel." La. C.Cr.P. art. 783(B). Haug having to miss a work related international conference would be considered undue hardship for Haug. Based on Haug's inability to remain impartial and having a commitment to attend an international work conference, the trial court did not err in granting the State's objection for cause for juror Haug.

The trial court granted the State's challenge for cause for juror Blanche. The State took the position that Blanche would be unable to be a fair and impartial juror. The defense did not object to the State's challenge for cause. As stated earlier, La. C.Cr.P. art. 841(A) provides that "[a]n irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence." In *State v. Campbell*, the Supreme Court of Louisiana held that the challenge for cause as

to the prospective juror "was not properly preserved for review by this court" because the "defense did not contemporaneously object to the trial court's ruling." 06-0286, pp. 81-82 (La. 5/21/08), 983 So. 2d 810, 862-63. Similarly, in the instant matter, because Defendants Robinson and West failed to preserve this issue for appeal by making a contemporaneous objection, we decline to consider this assignment of error.

## **DECREE**

Based on the foregoing reasons, we affirm Defendants' second-degree murder, attempted second-degree murder, conspiracy to commit second-degree murder, obstruction of justice, and conspiracy to obstruct justice convictions. We vacate the Defendants' sentences and remand for re-sentencing.

**CONVICTIONS AFFIRMED; REMANDED FOR RE-SENTENCING**